# EXHIBIT A

# LOAN AGREEMENT

Dated as of April 18, 2013

Between

**262 EAST FORDHAM REALTY LLC,**
as Borrower

and

**MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC,**
as Lender

# TABLE OF CONTENTS

**Page**

I.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................................... 1

    Section 1.1     Definitions ............................................................................................. 1

    Section 1.2     Principles of Construction ................................................................... 22

II.    THE LOAN ................................................................................................................... 22

    Section 2.1     The Loan .............................................................................................. 22

        2.1.1    Agreement to Lend and Borrow .................................................... 22

        2.1.2    Single Disbursement to Borrower ................................................. 22

        2.1.3    The Note ......................................................................................... 22

        2.1.4    Use of Proceeds ............................................................................. 22

    Section 2.2     Interest Rate ......................................................................................... 22

        2.2.1    Interest Rate ................................................................................... 22

        2.2.2    Intentionally Omitted .................................................................... 22

        2.2.3    Interest Calculation ....................................................................... 23

        2.2.4    Usury Savings ................................................................................ 23

    Section 2.3     Loan Payments .................................................................................... 23

        2.3.1    Payments Before Maturity Date .................................................... 23

        2.3.2    Intentionally Omitted .................................................................... 23

        2.3.3    Payment on Maturity Date ............................................................ 23

        2.3.4    Interest Rate and Payment after Default ....................................... 24

        2.3.5    Late Payment Charge ..................................................................... 24

        2.3.6    Method and Place of Payment ....................................................... 24

    Section 2.4     Prepayments ........................................................................................ 25

        2.4.1    Voluntary Prepayments .................................................................. 25

        2.4.2    Mandatory Prepayments ................................................................ 25

    Section 2.5     Taxes ................................................................................................... 26

    Section 2.6     Non-Confidentiality of Tax Treatment ............................................... 29

    Section 2.7     Intentionally omitted ........................................................................... 29

    Section 2.8     Assignment Upon Repayment ............................................................ 30

III.   REPRESENTATIONS AND WARRANTIES .............................................................. 30

    Section 3.1     Borrower Representations .................................................................... 30

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 3.1.1 | Organization | 30 |
| 3.1.2 | Proceedings | 31 |
| 3.1.3 | No Conflicts | 31 |
| 3.1.4 | Litigation | 31 |
| 3.1.5 | Agreements | 31 |
| 3.1.6 | Consents | 31 |
| 3.1.7 | Title | 32 |
| 3.1.8 | No Plan Assets | 32 |
| 3.1.9 | Compliance | 32 |
| 3.1.10 | Financial Information | 32 |
| 3.1.11 | Condemnation | 33 |
| 3.1.12 | Utilities and Public Access | 33 |
| 3.1.13 | Separate Lots | 33 |
| 3.1.14 | Assessments | 33 |
| 3.1.15 | Enforceability | 33 |
| 3.1.16 | Assignment of Leases | 33 |
| 3.1.17 | Insurance | 33 |
| 3.1.18 | Licenses | 33 |
| 3.1.19 | Flood Zone | 34 |
| 3.1.20 | Physical Condition | 34 |
| 3.1.21 | Boundaries | 34 |
| 3.1.22 | Leases | 34 |
| 3.1.23 | Filing and Recording Taxes | 34 |
| 3.1.24 | Single Purpose | 35 |
| 3.1.25 | Tax Filings | 40 |
| 3.1.26 | Solvency | 40 |
| 3.1.27 | Federal Reserve Regulations | 40 |
| 3.1.28 | Organizational Chart | 40 |
| 3.1.29 | Bank Holding Company | 40 |
| 3.1.30 | Investment Company Act | 40 |

# TABLE OF CONTENTS
### (continued)

**Page**

3.1.31 No Bankruptcy Filing ................................................................. 41

3.1.32 Full and Accurate Disclosure ................................................... 41

3.1.33 Foreign Person ........................................................................ 41

3.1.34 No Change in Facts or Circumstances; Disclosure .................. 41

3.1.35 Management Agreement ........................................................... 41

3.1.36 Perfection of Accounts ............................................................. 41

3.1.37 No Breach of Fiduciary Duty ................................................... 42

3.1.38 Intentionally Omitted ............................................................... 42

3.1.39 Illegal Activity/Forfeiture ........................................................ 42

3.1.40 Guarantor Representations ....................................................... 42

Section 3.2        Survival of Representations ............................................... 42

IV.    BORROWER COVENANTS ......................................................................... 42

Section 4.1        Borrower Affirmative Covenants ....................................... 42

4.1.1 Existence; Compliance with Legal Requirements ................... 42

4.1.2 Taxes and Other Charges ......................................................... 42

4.1.3 Litigation .................................................................................. 43

4.1.4 Access to Property ................................................................... 43

4.1.5 Further Assurances; Supplemental Mortgage Affidavits ......... 43

4.1.6 Financial Reporting .................................................................. 44

4.1.7 Title to the Property ................................................................. 46

4.1.8 Estoppel Statement ................................................................... 46

4.1.9 Leases ....................................................................................... 47

4.1.10 Alterations ................................................................................ 50

4.1.11 Intentionally Omitted ............................................................... 51

4.1.12 Material Agreements ................................................................. 51

4.1.13 Performance by Borrower ......................................................... 51

4.1.14 Costs of Enforcement/Remedying Defaults .............................. 51

4.1.15 Business and Operations ........................................................... 52

4.1.16 Intentionally Omitted ............................................................... 52

4.1.17 Intentionally Omitted ............................................................... 52

# TABLE OF CONTENTS
(continued)

Page

4.1.18  Intentionally Omitted ................................................................. 52

4.1.19  Maintenance of Property ............................................................ 52

4.1.20  O&M Plan ................................................................................... 52

4.1.21  Required Repairs ........................................................................ 52

Section 4.2          Borrower Negative Covenants ........................................... 52

4.2.1   Due on Sale and Encumbrance; Transfers of Interests ............ 52

4.2.2   Liens ........................................................................................... 53

4.2.3   Dissolution ................................................................................. 53

4.2.4   Change in Business .................................................................... 53

4.2.5   Debt Cancellation ...................................................................... 53

4.2.6   Intentionally Omitted ................................................................. 54

4.2.7   Zoning ........................................................................................ 54

4.2.8   Intentionally omitted .................................................................. 54

4.2.9   No Joint Assessment .................................................................. 54

4.2.10  Principal Place of Business ....................................................... 54

4.2.11  ERISA ........................................................................................ 54

4.2.12  Material Agreements .................................................................. 55

V.    INSURANCE, CASUALTY AND CONDEMNATION ................................ 55

Section 5.1          Insurance .......................................................................... 55

5.1.1   Insurance Policies ...................................................................... 55

5.1.2   Insurance Company .................................................................... 59

Section 5.2          Casualty and Condemnation ............................................ 60

5.2.1   Casualty ...................................................................................... 60

5.2.2   Condemnation ............................................................................ 60

5.2.3   Casualty Proceeds ...................................................................... 61

Section 5.3          Delivery of Net Proceeds ................................................ 61

5.3.1   Minor Casualty or Condemnation .............................................. 61

5.3.2   Major Casualty or Condemnation .............................................. 62

VI.   RESERVE FUNDS ...................................................................................... 65

Section 6.1          Required Repair Reserve. ................................................ 65

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 6.2 | Tax Funds | 65 |
| 6.2.1 | Deposits of Tax Funds | 65 |
| 6.2.2 | Release of Tax Funds | 66 |
| Section 6.3 | Insurance Funds | 66 |
| 6.3.1 | Deposits of Insurance Funds | 66 |
| 6.3.2 | Release of Insurance Funds | 66 |
| Section 6.4 | Intentionally Omitted | 66 |
| Section 6.5 | Capital Expenditure Funds | 66 |
| 6.5.1 | Deposits of Capital Expenditure Funds | 66 |
| 6.5.2 | Release of Capital Expenditure Funds | 67 |
| Section 6.6 | Rollover Funds | 67 |
| 6.6.1 | Deposits of Rollover Funds | 68 |
| 6.6.2 | Release of Rollover Funds | 68 |
| Section 6.7 | Cash Trap Funds | 69 |
| 6.7.1 | Deposits of Cash Trap Funds | 69 |
| 6.7.2 | Release of Cash Trap Funds | 70 |
| Section 6.8 | Application of Reserve Funds | 71 |
| Section 6.9 | Security Interest in Reserve Funds and Interest on Reserve Funds | 71 |
| 6.9.1 | Grant of Security Interest | 71 |
| 6.9.2 | Interest on Reserve Funds | 71 |
| 6.9.3 | Income Taxes | 72 |
| 6.9.4 | Prohibition Against Further Encumbrance | 72 |
| 6.9.5 | Reserve Fund Indemnification | 72 |
| 6.9.6 | Reserve Fund Fees and Expenses | 72 |
| VII. | PROPERTY MANAGEMENT | 72 |
| Section 7.1 | Self-Management | 72 |
| Section 7.2 | The Management Agreement | 72 |
| Section 7.3 | Prohibition Against Termination or Modification | 73 |
| Section 7.4 | Replacement of Manager | 73 |

# TABLE OF CONTENTS
(continued)

**Page**

VIII.   PERMITTED TRANSFERS .................................................................................. 74

    Section 8.1   Transfer of the Property ..................................................... 74

    Section 8.2   Permitted Transfers of Equity Interests ............................ 74

IX.   SALE AND SECURITIZATION OF MORTGAGE ....................................... 76

    Section 9.1   Sale of Mortgage and Securitization ................................ 76

    Section 9.2   Securitization Indemnification .......................................... 79

    Section 9.3   Rating Surveillance ........................................................... 81

X.   DEFAULTS .................................................................................................... 81

    Section 10.1   Event of Default ................................................................ 81

    Section 10.2   Remedies of Lender .......................................................... 83

    Section 10.3   Right to Cure Defaults ...................................................... 85

    Section 10.4   Remedies Cumulative ....................................................... 85

XI.   MISCELLANEOUS ........................................................................................ 85

    Section 11.1   Successors And Assigns .................................................... 85

    Section 11.2   Lender's Discretion ........................................................... 86

    Section 11.3   Governing Law .................................................................. 86

    Section 11.4   Modification, Waiver in Writing ....................................... 87

    Section 11.5   Delay Not a Waiver .......................................................... 88

    Section 11.6   Notices .............................................................................. 88

    Section 11.7   TRIAL BY JURY .............................................................. 89

    Section 11.8   Headings ........................................................................... 89

    Section 11.9   Severability ....................................................................... 89

    Section 11.10   Preferences ...................................................................... 89

    Section 11.11   Waiver of Notice ............................................................. 89

    Section 11.12   Remedies of Borrower .................................................... 90

    Section 11.13   Expenses; General Indemnity; Mortgage Tax Indemnity; ERISA Indemnity ............................................ 90

    Section 11.14   Schedules Incorporated ................................................... 91

    Section 11.15   Offsets, Counterclaims and Defenses .............................. 91

    Section 11.16   No Joint Venture or Partnership; No Third Party Beneficiaries ........ 92

## TABLE OF CONTENTS
(continued)

**Page**

Section 11.17   Publicity ........................................................................ 92

Section 11.18   Waiver of Marshalling of Assets ....................................... 92

Section 11.19   Waiver of Offsets/Defenses/Counterclaims....................... 92

Section 11.20   Conflict; Construction of Documents; Reliance ................ 93

Section 11.21   Brokers and Financial Advisors........................................ 93

Section 11.22   Exculpation ..................................................................... 93

Section 11.23   Prior Agreements ............................................................ 96

Section 11.24   Servicer ........................................................................... 97

Section 11.25   Joint and Several Liability ............................................... 97

Section 11.26   Creation of Security Interest ........................................... 97

Section 11.27   Assignments and Participations ....................................... 97

Section 11.28   Set-Off............................................................................ 100

# LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of April 18, 2013 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between 262 EAST FORDHAM REALTY LLC, a New York limited liability company, having an address c/o Crown Acquisitions, Inc., 767 Fifth Avenue, 24th Floor, New York, New York 10153 (together with its permitted successors and permitted assigns, "Borrower"), and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company, having an address at 1585 Broadway, 10th Floor, New York, New York 10036, (together with its successors and permitted assigns, "Lender").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.   For all purposes of this Agreement, except as otherwise expressly provided:

"Acceptable Delaware LLC" shall mean a limited liability company formed under Delaware law which (i) has at least two springing members, which, upon the dissolution of all of the members or the withdrawal or the disassociation of all of the members from such limited liability company, shall immediately become the sole members of such limited liability company, and (ii) otherwise meets the Rating Agency criteria then applicable to such entities.

"Accounts" shall mean "Accounts" as defined in the Cash Management Agreement plus any of the accounts that remain held by or for the benefit of Lender and which are not held pursuant to the Cash Management Agreement.

"Act" shall have the meaning set forth in Section 3.1.24(t)(i).

"Additional Guarantor" shall have the meaning set forth in Section 8.2(b).

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than forty percent (40%) of, is in control of, is Controlled by or is under common ownership or Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"Affiliated Manager" shall mean any managing Lender of the Property in which Borrower, Guarantor, any SPC Party (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Alteration Threshold" shall mean $600,000.00.

"Annual Budget" shall mean the operating and capital budget for the Property setting forth Borrower's good faith estimate of Gross Revenue, Operating Expenses, Capital Expenditures, and reasonably anticipated tenant improvements and leasing commissions for the applicable Fiscal Year.

"Approval", "approval" or "Approved" shall mean, as the context so determines, an approval in writing given to the party seeking approval after full disclosure to the party giving approval of all material facts necessary in order to determine whether full approval should be granted.

"Approved Accountant" shall have the meaning set forth in Section 4.1.6(b).

"Assignment and Acceptance" shall have the meaning set forth in Section 11.27.

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Management Agreement" shall mean that certain Conditional Assignment of Management Agreement and Subordination of Management Fees by and among Borrower, Manager and Lender, entered into in connection with Section 7.2, a form of which is attached hereto as Schedule IV.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"Bankruptcy Event" shall mean with respect to any Person, (i) the filing of a voluntary or involuntary petition under the Bankruptcy code or any other Federal or state bankruptcy or insolvency law against such Person; (ii)  such Person or its Affiliate files consents to or acquiesces in writing in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of its property; (iii) such Person makes an assignment for the benefit of creditors; or (iv) there is substantive consolidation of such Person with any other Person in connection with any federal or state bankruptcy proceeding.

"<u>Basic Carrying Costs</u>" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes and (ii) Insurance Premiums.

"<u>Borrower</u>" shall mean 262 East Fordham Realty LLC, a New York limited liability company, together with its permitted successors and permitted assigns.

"<u>Borrower Parties</u>" shall mean Borrower, Guarantor, and each of their respective Affiliates.

"<u>Business Day</u>" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

"<u>Capital Expenditures</u>" for any period shall mean amounts expended for replacements and alterations to the Property and required to be capitalized according to tax basis accounting standards.

"<u>Cash Management Agreement</u>" shall mean that certain Cash Management Agreement entered into among Lender, Borrower, and Manager on the date hereof.

"<u>Cash Management Bank</u>" shall mean Wells Fargo Bank, N.A. or such other bank approved by Lender, or such other bank approved by Lender holding the Deposit Account, as such term is defined in the Cash Management Agreement, pursuant to the Cash Management Agreement.

"<u>Cash Management Sweep Period</u>" shall mean the following:

(a) from and after the occurrence, and during the continuance, of any Event of Default, until such time as such Event of Default has been cured in accordance with the terms and provisions of this Agreement or otherwise to Lender's reasonable satisfaction (provided that no Cash Management Sweep Period remains in effect pursuant to clauses (b) and (c) below);

(b) the Debt Service Coverage Ratio is less than 1.15x for any three (3) consecutive months during the term of the Loan (with testing occurring on a quarterly basis and commencing after the end of the quarter), until such time as the Debt Service Coverage Ratio shall be at least 1.20x for at least six (6) calendar months (provided that no Cash Management Sweep Period remains in effect pursuant to clauses (a) above or clause (c) below).

(c) from and after the occurrence of a Tenant Vacancy Event, until such time as the Tenant Vacancy Event has been cured in accordance with the terms and provisions of this Agreement or otherwise to Lender's reasonable satisfaction (provided that no Cash Management Sweep Period remains in effect pursuant to clauses (a) and (b) above).

"<u>Cash Trap Funds</u>" shall have the meaning set forth in <u>Section 6.7.1</u>.

"Casualty" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"Casualty Consultant" shall have the meaning set forth in Section 5.3.2(c).

"Casualty Retainage" shall have the meaning set forth in Section 5.3.2(d).

"Chera Family Member" shall mean (i) Haim Chera, Isaac Chera, and Richard Chera and/or their respective spouses, parents, siblings, adopted children or lineal descendenans, and (ii) estates of and trusts formed for the benefit of such individuals.

"Closing Date" shall mean the date of funding the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"CPI" shall mean "The Consumer Price Index (New Series) (Base Period 1982-84=100) (all items for all urban consumers)" issued by the Bureau of Labor Statistics of the United States Department of Labor (the "Bureau"). If the CPI ceases to use the 1982-84 average equaling 100 as the basis of calculation, or if a change is made in the term, components or number of items contained in said index, or if the index is altered, modified, converted or revised in any other way, then the index shall be adjusted to the figure that would have reasonably been arrived at had the change in the manner of computing the index in effect at the date of this Agreement not been made. If at any time during the term of the Loan the CPI shall no longer be published by the Bureau, then any comparable index issued by the Bureau or similar agency of the United States issuing similar indices shall be used in lieu of the CPI.

"Debt" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon (including, without limitation, any interest that would accrue on the outstanding principal amount of the Loan through and including the end of any applicable Interest Period, even if such Interest Period extends beyond any applicable Monthly Payment Date, Prepayment Date or the Maturity Date) and all other sums (including, without limitation, if applicable, the Yield Maintenance Premium) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage, the Environmental Indemnity or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled principal and interest payments under the Note.

"<u>Debt Service Coverage Ratio</u>" shall mean the ratio of (i) Underwritten NOI (which will be adjusted by Lender solely for the purpose of calculating Debt Service Coverage Ratio to (x) exclude rent from any Lease with an initial term of less than five (5) years and (y) subject to <u>clause (x)</u>, to include income from executed and effective Leases including Leases under which the Tenant is not yet paying rent due to the inclusion of a free rent and/or construction period in such Lease provided that the free rent and/or construction period under any such Lease does not extend later than the Maurity Date) as of such date for the twelve (12) calendar month period immediately preceding the date of calculation to (ii) the projected Debt Service that would be due for the twelve (12) calendar month period immediately following such calculation. The Debt Service Coverage Ratio shall be calculated as of the final day of the applicable calendar quarter.  Lender's reasonable calculation of the Debt Service Coverage Ratio shall be conclusive and binding on Borrower absent manifest error.

"<u>Default</u>" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate.

"<u>Disclosure Document</u>" shall have the meaning set forth in <u>Section 9.2(a)</u>.

"<u>Environmental Indemnity</u>" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender.

"<u>Equipment</u>" shall have the meaning set forth in the granting clause of the Mortgage.

"<u>ERISA</u>" shall have the meaning set forth in <u>Section 4.2.11</u>.

"<u>Event of Default</u>" shall have the meaning set forth in <u>Section 10.1</u>.

"<u>Excess Cash Flow</u>" shall have the meaning set forth in the Cash Management Agreement.

"<u>Exchange Act</u>" shall have the meaning set forth in <u>Section 9.2(a)</u>.

"<u>Exchange Act Filing</u>" shall have the meaning set forth in <u>Section 9.l(c)</u>.

"<u>Excluded Taxes</u>" shall have the meaning set forth in <u>Section 2.5(f)</u>.

"<u>Exculpated Parties</u>" shall have the meaning set forth in <u>Section 11.22</u>.

"<u>Excusable Delay</u>" shall mean a delay due to acts of God, governmental restrictions, stays, judgments, orders, decrees, enemy actions, civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other causes beyond the reasonable

control of Borrower, but lack of funds in and of itself shall not be deemed a cause beyond the control of Borrower.

"Extraordinary Expense" shall have the meaning set forth in Section 4.1.6(e).

"Equity Collateral" shall have the meaning set forth in Section 9.4.

"Finish Line" shall mean The Finish Line, Inc., together with its successors and permitted assigns.

"Finish Line Lease" shall mean that certain Lease, by and between Borrower, as landlord, and Finish Line, as tenant, dated June 14, 2004, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time as permitted hereunder.

"Finish Line Space" shall mean the space demised pursuant to the Finish Line Lease.

"Fiscal Year" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"Fitch" shall mean Fitch, Inc.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"Governmental Authority" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise) whether now or hereafter in existence.

"Gross Revenue" shall mean all revenue, derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, non-recurring revenues as determined by Lender (provided, that, Lender agrees to reasonably review on a case by case basis any request from Borrower to include any lump sum payment by a tenant in its calculation of Gross Revenue), proceeds from the sale or refinancing of the Property, security deposits (except to the extent reasonably determined by Lender to be properly utilized to offset a loss of Rent), refunds and uncollectible accounts, proceeds of casualty insurance and Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), and any disbursements to Borrower from the Reserve Funds or any other fund established by the Loan Documents.

"Guarantor" shall mean Haim Chera, an individual.

"Guaranty" shall mean that certain Guaranty of Recourse Obligations of even date herewith from Guarantor for the benefit of Lender.

"Improvements" shall have the meaning set forth in the granting clause of the Mortgage.

"Indebtedness" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"Indemnified Liabilities" shall have the meaning set forth in Section 11.13(b).

"Indemnified Parties" shall have the meaning set forth in Section 11.l3(b).

"Insurance Funds" shall have the meaning set forth in Section 6.3.1.

"Insurance Premiums" shall mean the premiums then due for the Policies required to be maintained pursuant to Section 5.1.l(b).

"Interest Period" shall mean (a) for the first interest period hereunder, the period commencing on the Closing Date and ending on (and including) the last day of the calendar month in which the Closing Date occurs, and (b) for each interest period thereafter commencing May 1, 2013, the period commencing on the first (1st) day of each calendar month and ending on the last day of each calendar month.  Each Interest Period as set forth in clause (b) above shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"Interest Rate" shall mean a rate per annum equal to 4.12%.

"Lease" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Lease Termination Fee" shall have the meaning set forth in Section 6.6.1.

"<u>Legal Requirements</u>" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"<u>Lender</u>" shall have the meaning set forth in the preamble hereto.

"<u>Liabilities</u>" shall have the meaning set forth in <u>Section 9.2(b)</u>.

"<u>Lien</u>" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"<u>Liquidity</u>" shall have the meaning set forth in the Guaranty.

"<u>LLC Agreement</u>" shall have the meaning set forth in <u>Section 3.1.24(t)</u> hereof.

"<u>Loan</u>" shall mean the loan in the original principal amount of Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) made by Lender to Borrower pursuant to this Agreement.

"<u>Loan Bifurcation</u>" shall have the meaning set forth in <u>Section 9.1(b)(iv)</u>.

"<u>Loan Documents</u>" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Assignment of Management Agreement, the Cash Management Agreement, the Restricted Account Agreement and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Loan to Value Ratio</u>" shall mean the ratio of (i) the aggregate then outstanding principal balance of the Loan, on the date of such calculation to (ii) the fair market value of the Property on the date of such calculation (such value to be determined by the Lender in its sole discretion on a commercially reasonable valuation method using only the portion of the Property which constitutes acceptable real estate collateral under the Code for a REMIC Trust).

"<u>Lockbox Bank</u>" shall mean Wells Fargo Bank, N.A. or such other bank approved by Lender holding the restricted account pursuant to the Restricted Account Agreement.

"Losses" shall have the meaning set forth in Section 11.13(c).

"Management Agreement" shall mean any management agreement entered into by and between Borrower and a Manager in accordance with the terms hereof, pursuant to which such Manager manages, operates, rents and leases the Property and is entitled to certain management fees thereunder.

"Manager" shall mean (i) any Affiliate of Guarantor, provided such Affiliate is entirely owned (directly or indirectly) by Guarantor, and (ii) any Qualified Manager that becomes manager of the Propety in accordance with Section 7.2.

"Material Action" shall mean to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Borrower or SPC Party be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against the Borrower or SPC Party, to file a petition seeking, or consent to, reorganization or relief with respect to the Borrower or SPC Party under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Borrower or SPC Party or a substantial part of its property, to make any assignment for the benefit of creditors of the Borrower or SPC Party, to admit in writing the Borrower's or SPC Party's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"Material Adverse Effect" shall mean a material adverse effect on (i) the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower, Guarantor or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Mortgage or the other Loan Documents, or (iv) the ability of Borrower to perform its obligations under this Agreement or the other Loan Documents.

"Material Agreements" shall mean each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, under which there is an obligation of Borrower to pay more than $100,000.00 per annum.

"Maturity Date" shall mean May 1, 2023, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Member" shall have the meaning set forth in Section 3.1.24(cc)(i).

"Minimum Disbursement Amount" shall mean Ten Thousand and No/100 Dollars ($10,000).

"Modell's" shall mean Modell's NY II, Inc., a Delaware corporation, together with its successors and permitted assigns.

"Modell's Lease" shall mean that certain Lease, by and between Borrower, as landlord, and Modell's, as tenant, dated June 30, 2011, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time as permitted hereunder.

"Modell's Occupancy Failure" shall mean, upon the date that is twelve (12) months prior to the expiration of the Modell's Lease, the failure of Modell's to (i) be in full occupancy of the Modell's Space and open to the public and continuously operating for business therein (other than as a result of a Casualty or pursuant to the terms and provisions of the Modell's Lease) or (ii) exercise its right to renew the Modell's Lease pursuant to and in accordance with Section 1.6 thereof.

"Modell's Space" shall mean the space demised pursuant to the Modell's Lease.

"Monthly Debt Service Payment Amount" shall mean a constant monthly payment of $59,334.01.

"Monthly Payment Date" shall mean the first (1st) calendar day of each calendar month during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately preceding such day, commencing on June 1, 2013, and continuing to and including the Maturity Date.

"Moody's" shall mean Moody's Investors Service, Inc.

"Morgan Stanley" shall mean Morgan Stanley Mortgage Capital Holdings LLC and its Affiliates.

"Morgan Stanley Group" shall have the meaning set forth in Section 9.2(b).

"Mortgage" shall mean that certain first priority Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Net Proceeds" shall mean: (i) the net amount of all insurance proceeds (but excluding proceeds from the insurance required pursuant to Section 5.1.1(a)(iii)) payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"Net Proceeds Deficiency" shall have the meaning set forth in Section 5.3.2(f).

"Net Worth" shall have the meaning set forth in the Guaranty.

"Non-Excluded Taxes" shall have the meaning set forth in Section 2.5(a).

"Non-U.S. Corporate Lender" shall have the meaning set forth in Section 2.5(f).

"Note" shall mean that certain Consolidated, Amended and Restated Promissory Note, dated as of the date hereof, made by Borrower in favor of Lender, with an original principal balance equal to Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Notice" shall have the meaning set forth in Section 11.6.

"O&M Plan" shall mean the operations and maintenance plans for asbestos remediation at the Property approved to Lender.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"Open Prepayment Date" shall mean January 1, 2023.

"Operating Expenses" shall mean all expenses, computed in accordance with tax accounting basis principles or other sound and prudent accounting principles approved by Lender, of whatever kind and from whatever source, relating to the ownership, operation, repair, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including, without limitation (and without duplication), Taxes, Insurance Premiums, management fees (whether or not actually paid) equal to the greater of the actual management fees and three percent (3%) of annual Operating Income, costs attributable to the ordinary operation, repair and maintenance of the systems for heating, ventilation and air conditioning, advertising expenses, license fees, utilities, payroll and related taxes, computer processing charges, operating equipment or other lease payments as reasonably approved by Lender, ground lease payments (if any), bond assessments and other similar costs, in each instance, actually paid for by Borrower.  Operating Expenses shall not include Debt Service, capital expenditures, tenant improvement costs, leasing commissions, or other expenses which are paid from escrows required by the Loan Documents, any payment or expense for which Borrower was or is to be reimbursed from proceeds of the loan or insurance or by any third party, federal, state or local income taxes, any non-cash charges such as depreciation and amortization, any item of expense otherwise includable in Operating Expenses which is paid directly by any Tenant except real estate taxes paid directly to any taxing authority by any tenant and any one-time expense incurred by Borrower and reasonably approved by Lender.  Lender's reasonable calculation of Operating Expenses shall be conclusive and binding on Borrower absent manifest error.

"Operating Income" shall mean all revenue derived from the ownership and operation of the Property from whatever source, including, without limitation, common area maintenance, real estate tax recoveries, utility recoveries, other miscellaneous expense recoveries, other required pass-throughs, business interruption, rent loss or other similar

insurance proceeds, other miscellaneous income and rental income reflected in a current rent roll for all Tenants paying rent and in actual physical occupancy of their respective space demised pursuant to Leases which are in full force and effect (whether denominated as basic rent, additional rent, escalation payments, electrical payments or otherwise) and such Tenant is open for business, provided, that income from Tenants that have an investment grade rating and have not less than five (5) years remaining on their Lease term will be included as income if such Tenant is actually paying rent pursuant to a Lease which is in full force and effect without regard to whether such Tenant is actually in occupancy or open for business.  Operating Income shall not include insurance proceeds (other than proceeds of rent loss, business interruption or other similar insurance allocable to the applicable period), condemnation proceeds (other than condemnation proceeds arising from a temporary taking or the use and occupancy of all or part of the applicable Property allocable to the applicable period), proceeds of any financing, proceeds of any sale, exchange or transfer of the Property or any part thereof or interest therein, capital contributions or loans to Borrower or an Affiliate of Borrower, any item of income otherwise includable in Operating Income but paid directly by any Tenant to a Person other than Borrower, any other extraordinary, non-recurring revenues, payments paid by or on behalf of any Tenant under a Lease which is the subject of any proceeding or action relating to its bankruptcy, reorganization or other arrangement pursuant to the Bankruptcy Code or any similar federal or state law or which has been adjudicated a bankrupt or insolvent unless such Lease has been affirmed by the trustee in such proceeding or action pursuant to a final, non-appealable order of a court of competent jurisdiction, payments paid by or on behalf of any Tenant under a Lease the demised premises of which are not occupied either by such Tenant or by a sublessee thereof, payments paid by or on behalf of any Tenant under a Lease in whole or partial consideration for the termination of any Lease, sales tax rebates from any Governmental Authority, sales, use and occupancy taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, interest income from any source other than the Reserve Funds required pursuant to this Agreement or the other Loan Documents, unforfeited security deposits, utility and other similar deposits, income from Tenants not paying rent or any disbursements to Borrower from the Reserve Funds.  Lender's reasonable calculation of Operating Income shall be conclusive and binding on Borrower absent manifest error.

"Opposition Action" shall have the meaning set forth in Section 11.22.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Other Taxes" shall have the meaning set forth in Section 2.5(b).

"Otherwise Rated Insurer" shall have the meaning set forth in Section 5.1.2.

"Permitted Encumbrances" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"Permitted Equipment Leases" shall mean equipment leases or other similar instruments entered into with respect to the Equipment and/or the Personal Property provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Equipment and/or Personal Property which is (A) used in connection with the operation and maintenance of the Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the Property.

"Permitted Investments" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by any Servicer, Lender or any of their respective Affiliates, meeting one of the appropriate standards set forth below:

(i)     obligations of, or obligations fully guaranteed as to payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States of America including, without limitation, obligations of: the U.S. Treasury (all direct or fully guaranteed obligations), the Farmers Home Administration (certificates of beneficial ownership), the General Services Administration (participation certificates), the U.S. Maritime Administration (guaranteed Title XI financing), the Small Business Administration (guaranteed participation certificates and guaranteed pool certificates), the U.S. Department of Housing and Urban Development (local authority bonds) and the Washington Metropolitan Area Transit Authority (guaranteed transit bonds); *provided, however*, that the investments described in this clause (i) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(ii)    Federal Housing Administration debentures;

(iii)   obligations of the following United States government sponsored agencies: Federal Home Loan Mortgage Corp. (debt obligations), the Farm Credit System (consolidated systemwide bonds and notes), the Federal Home Loan Banks (consolidated debt obligations), the Federal National Mortgage Association (debt obligations), the Student Loan Marketing Association (debt obligations), the Financing Corp. (debt obligations), and the Resolution Funding Corp. (debt obligations); *provided, however*, that the investments described in this clause (iii) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(iv)    federal funds, unsecured certificates of deposit, time deposits, bankers' acceptances and repurchase agreements with maturities of not more than 365 days of any

bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category); *provided, however*, that the investments described in this clause (iv) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(v)     fully Federal Deposit Insurance Corporation-insured demand and time deposits in, or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association or savings bank, the short term obligations of which at all times are rated in the highest short term rating category by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency in the highest short term rating category); *provided, however*, that the investments described in this clause (v) must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have a "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(vi)     debt obligations with maturities of not more than 365 days and at all times rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency) in its highest long-term unsecured debt rating category; *provided, however*, that the investments described in this clause (vii) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(vii)     commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) with maturities of not more than 365 days and that at all times is rated by each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency) in its highest short-term unsecured debt rating; *provided*, *however*, that the investments described in this clause (vii) must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have a "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) not be subject to liquidation prior to their maturity;

(viii)     units of taxable money market funds or mutual funds, which funds are regulated investment companies, seek to maintain a constant net asset value per share and

have the highest rating from each Rating Agency (or, if not rated by all Rating Agencies, rated by at least one Rating Agency) for money market funds or mutual funds; and

(ix)     any other security, obligation or investment which has been approved as a Permitted Investment in writing by (a) Lender and (b) each Rating Agency rating a Securitization of the Loan, as evidenced by a written confirmation that the designation of such security, obligation or investment as a Permitted Investment will not, in and of itself, result in a downgrade, qualification or withdrawal of the initial or, if higher, then current ratings assigned to the certificates by such Rating Agency;

*provided, however*, that such instrument continues to qualify as a "cash flow investment" pursuant to Code Section 860G(a)(6) earning a passive return in the nature of interest and no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Permitted Transfer Date" shall mean the date that is thirty (30) days after the date of the Securitization of the Loan.

"Permitted Transferee" shall mean any one of the following Persons:

(i)                    a corporation, partnership or limited liability company acceptable to Lender in its sole discretion;

(ii)                    an investment bank, pension fund, pension trust, pension account or real estate private equity fund that immediately prior to such transfer owns, directly or indirectly, total real estate assets of at least $100,000,000;

(iii)                    a pension fund advisor who (a) immediately prior to such transfer, controls, directly or indirectly, at least $100,000,000 of real estate assets and (b) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (ii) of this definition;

(iv)                    an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (a) with a net worth, determined under GAAP as of a date no more than six (6) months prior to the date of the transfer of at least $50,000,000 and (b) who, immediately prior to such transfer, controls, directly or indirectly, real estate assets of at least $100,000,000;

(v)                    a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (a) with a combined capital and surplus of at least $50,000,000 and (b) who, immediately prior to such transfer, controls, directly or indirectly, real estate assets of at least $100,000,000;

(vi)                          any Person (a) who owns or operates at least 750,000 square feet (exclusive of the Property) of "Class A" office or retail space in metropolitan areas, (b) who has a net worth, determined as of a date no more than six (6) months prior to the date of such transfer, of at least $50,000,000 and (c) who, immediately prior to such transfer, controls, directly or indirectly, real estate assets of at least $100,000,000; or

(vii)                          any Person in which fifty percent (50%) or more of the ownership interests are owned directly or indirectly by any of the entities listed in subsections (i) through (vi) of this definition of "Permitted Transferee", or any combination of more than one such entity, and which is controlled directly or indirectly by such entity or entities;

provided that, in each case set forth in clauses (i) through (vii) above, such Person upon the formation of a directly or indirectly wholly owned subsidiary entity, qualifies as a bankruptcy remote entity under criteria established by the Rating Agencies.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Policies" shall have the meaning specified in Section 5.1.1(b).

"Prepayment Date" shall mean the date on which the Loan is prepaid in accordance with the terms hereof.

"Prescribed Laws" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"Prior Mortgage Loan" shall mean that certain loan made by UBS Real Estate Investments Inc. to Borrower in the principal amount of Ten Million and 00/100 Dollars ($10,000,000.00) and evidenced by that certain Consolidated, Amended and Restated Mortfgage Note, dated June 25, 2004, made by Borrower in favor of UBS Real Estate Investments Inc., and assigned to U.S. Bank National Association, as trustee, as successor-in-interest to Bank of America, N.A., successor-by-merger to LaSalle Bank National Association, as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2004-C6, Commercial Mortgage Pass-Through Certificates, Series 2004-C6.

"Property" shall mean the parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, all as more particularly described in the Granting Clauses of the Mortgage.

"Property Condition Report" shall have the meaning set forth in Section 3.1.20.

"Property Sale" shall have the meaning set forth in Section 8.1.

"Qualified Chera Family Member" shall mean, as of any determination date, a Chera Family Member that (i) is qualified to act in a managerial capacity with respect to Borrower equivalent to that of president or manager of Borrower, and (ii) possesses reasonably sufficient real estate management and/or operational experience, which Chera Family Member is reasonably approved by Lender (which such approval by Lender shall include searches (judgment, lien, litigation, tax, and bankruptcy for such Person) reasonably acceptable to Lender).

"Qualified Manager" shall mean a reputable and experienced management organization possessing experience in managing properties similar in size, scope and value to the Property, provided that Borrower shall have obtained the prior written consent of Lender for such entity (such consent not to be unreasonably withheld or delayed).

"Rating Agencies" shall mean each of S&P, Moody's, Fitch and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing); provided, that, the foregoing shall only be deemed to be included within the definition of "Rating Agencies" hereunder to the extent that the same have rated (or are reasonably anticipated by Lender to rate) the Securities.

"Registration Statement" shall have the meaning set forth in Section 9.2(b).

"Regulation AB" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"Related Loan" shall mean a loan made to an Affiliate of Borrower or secured by a Related Property, that is included in a Securitization with the Loan.

"Related Property" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related", within the meaning of the definition of Significant Obligor, to the Property.

"Release Date" shall mean the earlier to occur of (i) the third year and six month anniversary of the Closing Date and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust established in connection with the last Securitization involving any portion of this Loan.

"Relevant Sections" shall have the meaning set forth in Section 9.2(b).

"Rent Deficiency" shall have the meaning set forth in Section 6.6.2.

"Rents" shall mean all rents, moneys payable as damages or in lieu of rent, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or

nature received by or paid to or for the account of or benefit of Borrower or Lender or employees from any and all sources arising from or attributable to the Property.

"Replacement Lease" shall mean a Lease for space in the Property entered into in accordance with the terms and provisions of Section 4.1.9 hereof pursuant to which (i) the Tenant under the such Lease is in full occupancy of the space leased pursuant to such Lease (provided that the foregoing shall not require such Tenant to be open for business in such space), (ii) all rent payable by the Tenant thereunder to Borrower shall be due to be paid in full without abatement, and (iii) such Tenant has delivered to Borrower a tenant estoppel certificate reasonably acceptable to Lender; provided, however, that if Borrower enters into a Replacement Lease with a free rent or rent abatement period, Borrower may elect to escrow the amount of any free or abated rent under the Replacement Lease with Lender, in which event such free rent will be included in Lender's calculation of Gross Revenue.

"Replacement Tenant" shall mean a Tenant under any Replacement Lease.

"Required Repairs" shall have the meaning set forth in Section 4.1.22.

"Reserve Funds" shall mean, collectively, the Insurance Funds, the Tax Funds, the Fourth Floor Leasing Reserve Funds, the Rollover Funds and the Cash Trap Funds.

"Restoration" shall have the meaning set forth in Section 5.2.1.

"Restoration Threshold" shall mean $600,000.00.

"Restricted Account" shall mean that certain deposit account established pursuant to the Restricted Account Agreement.

"Restricted Account Agreement" shall mean that certain Restricted Account Agreement, dated as of the date hereof, among Lender, Borrower, Manager and Lockbox Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Restricted Party" shall mean Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Guarantor, any SPC Party (if any), any Affiliated Manager or any non-member manager.

"Rollover Funds" shall have the meaning set forth in Section 6.6.1.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

"Secondary Market Transaction" shall have the meaning set forth in Section 9.1(a).

"Section 2.5 Taxes" shall have the meaning set forth in Section 2.5.

"Securities" shall have the meaning set forth in Section 9.l(a).

"Securities Act" shall have the meaning set forth in Section 9.2(a).

"Securitization" shall have the meaning set forth in Section 9.l(a).

"Servicer" shall have the meaning set forth in Section 11.24.

"Servicing Agreement" shall have the meaning set forth in Section 11.24.

"Severed Loan Documents" shall have the meaning set forth in Section 10.2(c).

"Significant Obligor" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"SPC Party" shall have the meaning set forth in Section 3.1.24(bb).

"Springing Member" shall have the meaning set forth in Section 3.1.24(cc).

"State" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"Survey" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"Tax Funds" shall have the meaning set forth in Section 6.2.1.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"Tenant" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"Tenant Vacancy Event" shall mean any of the following:

(a) the occurrence of a Bankruptcy Event with respect to a either Finish Line or Modell's (a "Bankrupt Tenant") until such time as;

(i) such Bankrupt Tenant affirms its Lease at the Property in connection with the Bankruptcy Event, or

(ii) such Bankrupt Tenant's space at the Property (the "Bankrupt Tenant's Premises") is re-leased to a Replacement Tenant (or Tenants) pursuant to and in accordance with Section 4.1.9 hereof (a "Bankruptcy Replacement Lease") and (x) such Replacement Tenant is in full occupancy of the Bankrupt Tenant's Premises (provided that the foregoing shall not require such Replacement Tenant to be open for business in the Bankrupt Tenant's Premises), (y) all rent payable by such Replacement Tenant to Borrower shall be due to be paid in full without abatement, and (z) such Replacement Tenant has delivered a tenant estoppel certificate reasonably acceptable to Lender; provided, however, that if Borrower enters into a Bankruptcy Replacement Lease with a free rent or rent abatement period, Borrower may elect to escrow the amount of any free or abated rent under the Bankruptcy Replacement Lease with Lender, in which event such free rent will be included in Lender's calculation of Gross Revenue; or

(b) the occurrence and continuance of a Modell's Occupancy Failure until such time as either (i) Modell's renews the Modell's Lease for the Modell's Space pursuant to and in accordance with Section 1.6 of the Modell's Lease, or (ii) Borrower enters into one or more Replacement Leases for the Modell's Space.

"Termination Space" shall have the meaning set forth in Section 6.6.1.

"Title Insurance Policy" shall mean an ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the lien of the Mortgage.

"Transfer Conditions" shall have the meaning set forth in Section 8.2(a).

"Trustee" shall mean any trustee holding the Loan in a Securitization.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State or comparable law of any jurisdiction as in effect from time to time.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b).

"Underwritten NOI" shall mean Underwritten Operating Income less Underwritten Operating Expenses. Lender's reasonable calculation of Underwritten NOI shall be conclusive and binding on Borrower absent manifest error.

"Underwritten Operating Expenses" shall mean trailing twelve (12) month Operating Expenses adjusted upwards (but not downwards) by CPI and anticipated increases in Operating Expenses (including, without limitation, increases in connection with new Leases). Lender's reasonable calculation of Underwritten Operating Expenses shall be conclusive and binding on Borrower absent manifest error.

"Underwritten Operating Income" shall mean annualized Operating Income based on (a) the most recent rent roll (including with respect to base rent and escalations) without

giving credit for (i) Leases that have free rent and/or construction periods in excess of 6 months after the date of determination, (ii) Leases under which the commencement date has not yet occurred or (iii) Leases under which the applicable Tenant is more than 60 days delinquent in its base rent obligation, provided, however, that if such Tenant makes a partial payment of rent, such partial payment shall be included in the calculation of Underwritten Operating Income, and (b) other items of recurring revenue based on a trailing twelve (12) month period. Notwithstanding the foregoing, if the free rent and/or construction period for any Lease exceeds six months, provided that Tenant's payment obligation thereunder is only conditioned upon the expiration of a certain period of time (and not any additional undertaking by Borrower) then income from such executed and effective Lease shall be included in the calculation of Underwritten Operating Income to the extent Borrower deposits in a Lender-controlled reserve account an amount equal to the initial monthly rent payment under such Lease multiplied by the number of months that the free rent and/or construction period exceeds six months.  Provided no Event of Default shall then be continuing, the applicable Lease shall be in full force and effect and the date that the applicable Tenant's rent obligation is scheduled to commence thereunder shall not have been delayed or postponed, such reserve shall be disbursed by Lender into the Restricted Account in an amount equal to the initial monthly rent payment under such Lease each month commencing on the second succeeding Monthly Payment Date from the date such reserve was established; provided, however, notwithstanding the foregoing, in no event shall such reserve be disbursed into the Restricted Account later than the earlier of the date that the applicable Tenant under such Lease commences paying its rent in full and the repayment of the Loan in full.   Lender's reasonable calculation of Underwritten Operating Income shall be conclusive and binding on Borrower absent manifest error.

"Updated Information" shall have the meaning set forth in Section 9.l(b)(i).

"U.S. Obligations" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call, or early redemption.

"Yield Maintenance Premium" shall mean an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid or (ii) the present value as of the Prepayment Date of the Calculated Payments from the Prepayment Date through the Open Prepayment Date determined by discounting such payments at the Discount Rate.  As used in this definition, the term "Prepayment Date" shall mean the date on which prepayment is made.  As used in this definition, the term "Calculated Payments" shall mean the monthly payments of interest only which would be due based on the principal amount of the Loan being prepaid on the Prepayment Date and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the Interest Rate and (z) the Yield Maintenance Treasury Rate.  As used in this definition, the term "Discount Rate" shall mean the rate which, when compounded monthly, is equivalent to the Yield Maintenance Treasury Rate, when compounded semi-annually.  As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Government Securities/Treasury Constant Maturities for the week ending prior to the Prepayment Date, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Maturity Date.  In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield

Maintenance Treasury Rate.  In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise.

**Section 1.2    Principles of Construction**.    All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any Loan Document shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, replaced and/or restated from time to time (and, in the case of any note or other instrument, to any instrument issued in substitution therefor).  Unless otherwise specified, the words ''hereof,'' "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    THE LOAN

### Section 2.1    The Loan

**2.1.1    Agreement to Lend and Borrow**.  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

**2.1.2    Single Disbursement to Borrower**.  Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3    The Note**.  The Loan shall be evidenced by that certain Consolidated, Amended and Restated Promissory Note of even date herewith, in the stated principal amount of Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) executed by Borrower and payable to the order of Lender in evidence of the Loan (as the same may hereafter be amended, supplemented, restated, increased, extended or consolidated from time to time, the "Note") and shall be repaid in accordance with the terms of this Agreement and the Note.

**2.1.4    Use of Proceeds**.  Borrower shall use proceeds of the Loan to (i) pay all past due Basic Carrying Costs, if any, in respect of the Property, (ii) deposit the Reserve Funds, (iii) pay costs and expenses incurred in connection with the ownership of the Property and the closing of the Loan, as approved by Lender, (iv) fund any working capital requirements of the Property, as approved by Lender, (v) refinance the Prior Mortgage Loan, (vi) retain the balance, if any, and distribute to direct and indirect members and owners of Borrower and (vii) make any other payments or for any other uses permitted by Legal Requirements.

### Section 2.2    Interest Rate

**2.2.1    Interest Rate**.  Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date up to but excluding the Maturity Date at the Interest Rate.

**2.2.2    Intentionally Omitted.**

**2.2.3   Interest Calculation.**  Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.  The accrual period for calculating interest due on each Monthly Payment Date shall be the month immediately prior to such Monthly Payment Date.

**2.2.4   Usury Savings**.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**Section 2.3   Loan Payments**

**2.3.1   Payments Before Maturity Date**.

(a)   Borrower shall make a payment to Lender of interest only on the Closing Date for the period from the Closing Date through the last day of the Interest Period in which the Closing Date occurs (unless the Closing Date is the first day of a calendar month, in which case no such separate payment of interest shall be due).

(b)   On the Monthly Payment Date occurring in June, 2013, and on each Monthly Payment Date thereafter to and including the Monthly Payment Date in May, 2016, Borrower shall make a payment to Lender of interest only accruing hereunder during the preceding Interest Period.

(c)   On the Monthly Payment Date occurring in June, 2016, and on each Monthly Payment Date thereafter to and including the Maturity Date, Borrower shall make a payment to Lender of principal and interest in the amount of the Monthly Debt Service Payment Amount.  Each payment shall be applied first to accrued and unpaid interest and the balance to principal.

**2.3.2   Intentionally Omitted**.

**2.3.3   Payment on Maturity Date**.  Borrower shall pay to Lender on the Maturity Date (i) the outstanding principal balance of the Loan and (ii) all accrued and unpaid

interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents, including, without limitation, all interest that would accrue on the Note through and including the end of the Interest Period in which the Maturity Date occurs (even if such Interest Period extends beyond the Maturity Date).

      **2.3.4**   **Interest Rate and Payment after Default**.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Note shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such an Event of Default without regard to any grace or cure periods contained herein.  If during the continuance of an Event of Default payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, whether upon acceleration of the Loan or otherwise, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay, in addition to the outstanding principal balance, (a) all other amounts due hereunder, (b) all accrued and unpaid interest (including, without limitation, (i) in the event that such prepayment is received on a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which such Monthly Payment Date occurs, or (ii) in the event that such prepayment is received on a date other than a Monthly Payment Date, interest accruing on such amount calculated through and including the end of the Interest Period in which the next Monthly Payment Date occurs), and (c) if such prepayment is being made prior to the Release Date, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, in each case together with the Yield Maintenance Premium calculated with respect to the amount of principal being repaid.

      **2.3.5**   **Late Payment Charge**.  If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Mortgage and the other Loan Documents.

      **2.3.6**   **Method and Place of Payment**.  (a) Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 11:00 A.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

      (b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the Business Day immediately preceding such day.

      (c)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

### Section 2.4     Prepayments

#### 2.4.1     **Voluntary Prepayments**.

(a)     At any time following the date that is the second (2nd) anniversary of the Securitization of the Loan, Borrower may, at its option, prepay the entire Debt in whole (but not in part) provided that if such prepayment is made prior to the Open Prepayment Date, then Borrower shall also be required to pay to Lender the Yield Maintenance Premium in connection with any such prepayment.

(b)     Borrower shall provide prior written notice to Lender specifying the date upon which any such prepayment is to be made (the "Prepayment Date"), which notice shall be delivered to Lender not less than twenty (20) days prior to such Prepayment Date (or such shorter period of time as may be permitted by Lender in its sole discretion) and which notice shall be irrevocable, provided, that, any prepayment notice given to Lender by Borrower pursuant to the preceding sentence may be rescinded by Borrower upon delivery of written notice to Lender not less than five (5) Business Days prior to the Prepayment Date specified in the prepayment notice being rescinded and provided all out-of-pocket costs and expenses actually incurred by Lender in connection with the rescission of such prepayment shall be paid by Borrower within five (5) Business Days after demand.

(c)     If such prepayment is made on a Monthly Payment Date, then in connection with such prepayment, Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the Note calculated on the principal balance of the Note which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date.

(d)     If such prepayment is made on a day other than a Monthly Payment Date, then in connection with such prepayment, Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the Note calculated on the principal balance of the Note which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date.  Any prepayment received by Lender on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan and shall be applied to the Debt on the next Monthly Payment Date.

#### 2.4.2     **Mandatory Prepayments**.

On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for a Restoration, Borrower shall, at Lender's option, but subject to the terms and provisions of Article V, prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds together with interest that would have accrued on such amounts through the next Monthly Payment Date.  No Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.4.2. Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date.

**Section 2.5    Taxes.**

(a)    Any and all payments by Borrower under or in respect of this Agreement or any other Loan Document to which Borrower is a party shall be made free and clear of, and without deduction or withholding for or on account of, any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto, whether now or hereafter imposed, levied, collected, withheld or assessed by any taxation authority or other Governmental Authority (collectively, "Section 2.5 Taxes"), unless required by law.  If Borrower shall be required under any applicable Legal Requirement to deduct or withhold any Section 2.5 Taxes from or in respect of any sum payable under or in respect of this Agreement or any of the other Loan Documents to Lender, (i) Borrower shall make all such deductions and withholdings in respect of Section 2.5 Taxes, (ii) Borrower shall pay the full amount deducted or withheld in respect of Section 2.5 Taxes to the relevant taxation authority or other Governmental Authority in accordance with the applicable Legal Requirement, and (iii) the sum payable by Borrower shall be increased as may be necessary so that after Borrower and Lender have made all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 2.5) Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made in respect of Non-Excluded Taxes.  For purposes of this Agreement "Non-Excluded Taxes" are Section 2.5 Taxes other than, in the case of Lender, Section 2.5 Taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which Lender is organized or of its Applicable Lending Office, or any political subdivision thereof, unless such Section 2.5 Taxes are imposed as a result of Lender having executed, delivered or performed its obligations or received payments under, or enforced, this Agreement or any of the other Loan Documents (in which case such Section 2.5 Taxes will be treated as Non-Excluded Taxes).

(b)    In addition, Borrower hereby agrees to pay any present or future stamp, recording, documentary, excise, property or similar taxes, charges or levies that arise from any payment made under or in respect of this Agreement or any other Loan Document or from the execution, delivery or registration of, any performance under, or otherwise with respect to, this Agreement, the Notes or any other Loan Document (collectively, "Other Taxes").

(c)    Borrower hereby agrees to indemnify Lender for, and to hold Lender harmless against, the full amount of Non-Excluded Taxes and Other Taxes, and the full amount of Section 2.5 Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 2.5, imposed on or paid by Lender, as the case may be, and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  The indemnity by Borrower provided for in this Section 2.5(c) shall apply and be made whether or not the Non-Excluded Taxes or Other Taxes for which indemnification hereunder is sought have been correctly or legally asserted.  Amounts payable by Borrower under the indemnity set forth in this Section 2.5(c) shall be paid within 10 days from the date on which Lender makes written demand therefor.

(d)    Lender pursuant to Section 2.5(a) shall take all reasonable actions (consistent with its internal policy and legal and regulatory restrictions) requested by Borrower to assist Borrower, as the case may be, at the sole expense of Borrower, to recover from the

relevant taxation authority or other Governmental Authority any Section 2.5 Taxes in respect of which amounts were paid by Borrower pursuant to Sections 2.5(a), (b) or (c).  However, Lender will not be required to take any action that would be, in the sole judgment of Lender, legally inadvisable, or commercially or otherwise disadvantageous to Lender in any respect, and in no event shall Lender be required to disclose any tax returns or any other information that, in the sole judgment of Lender is confidential.

(e)     Within 30 days after the date of any payment of Section 2.5 Taxes, Borrower (or any Person making such payment on behalf of Borrower) shall furnish to Lender for its own account or for the account of Lender, as the case may be, a certified copy of the original official receipt evidencing payment thereof.  In the case of any payment under or in respect of this Agreement or any of the other Loan Documents by or on behalf of Borrower through an account or branch outside the United States, or on behalf of Borrower by a payor that is not a United States person, if Borrower determines that no Section 2.5 Taxes are payable in respect thereof, Borrower shall furnish, or shall cause such payor to furnish, to Lender an opinion of counsel reasonably acceptable to Lender stating that such payment is exempt from Section 2.5 Taxes.  For purposes of this Section 2.5(e) and subsection (f) of this Section 2.5, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(f)     Lender (including for avoidance of doubt any Participant, assignee or successor) that either (i) is not incorporated under the laws of the United States, any State thereof, or the District of Columbia or (ii) whose name does not include "Incorporated," "Inc.," "Corporation," "Corp.," "P.C.," "insurance company," or "assurance company" (a "Non-U.S. Corporate Lender") shall deliver or caused to be delivered to Borrower the following properly completed and duly executed documents:

(1)     a complete and executed (x) U.S. Internal Revenue Form W-8BEN with Part II completed in which Lender claims the benefits of a tax treaty with the United States providing for a zero or reduced rate of withholding (or any successor forms thereto), including all appropriate attachments or (y) a U.S. Internal Revenue Service Form W-8ECI (or any successor form thereto); or

(2)     in the case of an individual, (x) a complete and executed U.S. Internal Revenue Service Form W-8BEN (or any successor form thereto) and a certificate in a form reasonably acceptable to Lender (a "Section 2.5 Certificate") or (y) a complete and executed Internal Revenue Service Form W-9; or

(3)     in the case of a Non-U.S. Corporate Lender that is organized under the laws of the United States, any State thereof, or the District of Columbia, (x) a complete and executed Internal Revenue Service Form W-9 (or any successor thereto), including all appropriate attachments or (y) if such Non-U.S. Corporate Lender is disregarded for federal income tax purposes, the documents that would be required by clause (1), (2), (3), (4) or (5) with respect to its beneficial owner if such beneficial owner were a Lender; or

(4)     in the case of a Non-U.S. Corporate Lender that (i) is not organized under the laws of the United States, any State thereof, or the District of Columbia <u>and</u> (ii) is treated as a corporation for U.S. federal income tax purposes, a complete and executed U.S. Internal Revenue Service Form W-8BEN claiming a zero rate of withholding (or any successor forms thereto) <u>and</u> a Section 2.5 Certificate; <u>or</u>

(5)     in the case of a Non-U.S. Corporate Lender that (A) is treated as a partnership or other non-corporate entity, or is disregarded for U.S. federal income tax purposes and (B) is not organized under the laws of the United States, any State thereof, or the District of Columbia, a (x) a complete and executed Internal Revenue Service Form W-8IMY (or any successor form thereto) (including all required documents and attachments) and (y)(i) a Section 2.5 Certificate, and (ii) without duplication, with respect to each of its beneficial owners and the beneficial owners of such beneficial owners looking through chains of owners to individuals or entities that are treated as corporations for U.S. federal income tax purposes (all such owners, a "<u>beneficial owners</u>"), the documents that would be required by clause (1), (2), (3), (4) or this clause (5) with respect to each such beneficial owner if such beneficial owner were a Lender, <u>provided</u>, <u>however</u>, that no such documents will be required with respect to a beneficial owner to the extent the actual Lender is determined to be in compliance with the requirements for certification on behalf of its beneficial owner as may be provided in applicable U.S. Treasury regulations, or the requirements of this clause (5) are otherwise determined to be unnecessary, all such determinations under this clause (5) to be made in the sole discretion of Borrower.

If the forms referred to above in this <u>Section 2.5(f)</u> that are provided by Lender at the time Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be treated as "<u>Excluded Taxes</u>" (any Section 2.5 Taxes other than "Non-Excluded Taxes") and shall not qualify as Non-Excluded Taxes unless and until Lender provides the appropriate form certifying that a lesser rate applies, whereupon withholding tax at such lesser rate shall be considered Excluded Taxes solely for the periods governed by such form. However, if, on the date of the Assignment and Acceptance pursuant to which Lender assignee becomes a party to this Agreement, Lender assignor was entitled to payments under subsection (a) of this <u>Section 2.5</u> in respect of United States withholding tax with respect to interest paid at such date, then, to such extent (and only to such extent), the term "Non-Excluded Taxes" shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Section 2.5 Taxes) United States withholding tax, if any, applicable with respect to Lender assignee on such date.  Any additional Section 2.5 Taxes in respect of Lender that result solely and directly from a change in the Applicable Lending Office of Lender shall be treated as Excluded Taxes (and shall not qualify as Non-Excluded Taxes) unless (A) any such additional Section 2.5 Taxes are imposed as a result of a change in the applicable Legal Requirements, or in the interpretation or application thereof, occurring after the date of such change or (B) such change is made pursuant to the terms of <u>Section 2.5(d)</u> or subsection (i) of this <u>Section 2.5</u> or otherwise as a result of a request therefor by Borrower.

(g)     For any period with respect to which Lender has failed to provide Borrower with the appropriate form, certificate or other document described in subsection (f) of

this Section 2.5 (other than (i) if such failure is due to a change in any applicable Legal Requirement, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided (ii) if such form, certificate or other document otherwise is not required under subsection (f) of this Section 2.5 or (iii) if it is legally inadvisable or otherwise commercially disadvantageous for Lender to deliver such form, certificate or other document), Lender shall not be entitled to payment or indemnification under subsection (a) or (c) of this Section 2.5 with respect to Non-Excluded Taxes imposed by the United States by reason of such failure; provided, however, that should Lender become subject to Non-Excluded Taxes because of its failure to deliver a form, certificate or other document required hereunder, Borrower shall take such steps as Lender shall reasonably request to assist Lender in recovering such Non-Excluded Taxes.

(h)     Lender hereby agrees that, upon the occurrence of any circumstances entitling Lender to additional amounts pursuant to this Section 2.5, Lender shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions), at the sole expense of the Borrower, to designate a different Applicable Lending Office if the making of such a change would avoid the need for, or materially reduce the amount of, any such additional amounts that may thereafter accrue and would not be, in the sole judgment of Lender, legally inadvisable or commercially or otherwise disadvantageous to Lender in any respect.

(i)     If Lender is entitled to additional compensation under any of the foregoing provisions of this Section 2.5 and shall fail to designate a different Applicable Lending Office as provided in subsection (h) of this Section 2.5, then, so long as no Default or Event of Default shall have occurred and be continuing, Borrower may cause Lender to (and, if Borrower so demands, Lender shall) assign all of its rights and obligations under this Agreement to one or more other Persons identified by Borrower and reasonably acceptable to the Lender; provided that if, upon such demand by Borrower, Lender elects to waive its request for additional compensation pursuant to this Section 2.5, the demand by Borrower for Lender to so assign all of its rights and obligations under this Agreement shall thereupon be deemed withdrawn.  Nothing in subsection (h) of this Section 2.5 or this Section 2.5(i) shall affect or postpone any of the rights of Lender or any of the obligations of Borrower under any of the foregoing provisions of this Section 2.5 in any manner.

Section 2.6     **Non-Confidentiality of Tax Treatment**.     Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the purported or claimed U.S. federal income tax treatment of this Agreement, any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of this Agreement, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal income tax treatment or fact, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal income tax treatment of the Agreement to the taxpayer and is not relevant to understanding the purported or claimed federal income tax treatment of the Agreement to the taxpayer.

Section 2.7     **Intentionally omitted.**

**Section 2.8      Assignment Upon Repayment**.

Upon repayment of the Loan in accordance with the terms of this Agreement, Lender shall, at Borrower's option, either deliver and satisfaction and discharge of the Mortgage, or assign the Note and the Mortgage, each without recourse, covenant or warranty of any nature, express or implied, to such new lender designated by Borrower (other than Borrower or a nominee of Borrower) provided that Borrower (i) has executed and delivered to such new lender a new note to be secured by the Property and (ii) has complied with all other provisions of this Agreement.   In addition, any such assignment shall be conditioned on the following:   (A) payment by Borrower of (I) Lender's then reasonable and customary administrative fee for processing assignments of mortgage; (II) the reasonable expenses of Lender actually incurred in connection therewith; and (III) Lender's reasonable attorney's fees for the preparation, delivery and performance of such an assignment; (B) Borrower shall have caused the delivery of an executed Statement of Oath under Section 275 of the New York Real Property Law; (C) such new lender shall materially modify the Note such that it shall be treated as a new loan for federal tax purposes; (D) such an assignment is not then prohibited by any federal, state or local law, rule, regulation, order or by any other governmental authority; (E) such assignment and the actions described above do not constitute a prohibited transaction for any REMIC Trust formed pursuant to a Secondary Market Transaction and will not disqualify such REMIC Trust as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such assignment, and an opinion of counsel to Borrower to that effect is delivered to Lender in a form that would be reasonably satisfactory to a prudent lender; and (F) Borrower shall provide such other opinions, items, information and documents which a prudent lender would require to effectuate such assignment.   Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such assignment.   Lender agrees that the assignment of the Note and Mortgage to the new lender shall be accomplished by an escrow closing conducted through an escrow agent reasonably satisfactory to Lender and pursuant to an escrow agreement satisfactory to Lender in form and substance.

**III.      REPRESENTATIONS AND WARRANTIES**

**Section 3.1      Borrower Representations**

**3.1.1      Organization**

(a)      Each of Borrower and each SPC Party is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder, and Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

(b)      Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.   Borrower is an organization of the type specified in the first paragraph of this

Agreement. Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's organizational identification number assigned by the state of its incorporation or organization is 3007182. Borrower's federal tax identification number is 20-0708203. Borrower is not subject to back-up withholding taxes.

          **3.1.2**   **Proceedings**. This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

          **3.1.3**   **No Conflicts**. The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents or any agreement or instrument to which Borrower is a party or by which it is bound, or any order or decree applicable to Borrower, or result in the creation or imposition of any lien on any of Borrower's assets or property (other than pursuant to the Loan Documents).

          **3.1.4**   **Litigation**. There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower, Borrower Parties, or Guarantor in any court or by or before any other Governmental Authority which would materially and adversely affect the ability of Borrower to carry out the transactions contemplated by this Agreement.

          **3.1.5**   **Agreements**. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.

          **3.1.6**   **Consents**. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

     **3.1.7**  **Title**.  Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances.  The Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances.  To the best of Borrower's knowledge, there are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage.  None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage and this Agreement, materially and adversely affect the value of the Property, impair the use or operations of the Property or impair Borrower's ability to pay its obligations in a timely manner.

     **3.1.8**  **No Plan Assets**.  As of the date hereof and throughout the term of the Loan  (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans.

     **3.1.9**  **Compliance**.  Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and Prescribed Laws.  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

     **3.1.10**  **Financial Information**.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property, Borrower and Guarantor (i) is true, complete and correct in all material respects, (ii) accurately represents the financial condition of the Property, Borrower and Guarantor, as applicable, as of the date of such reports, and (iii) has been prepared in accordance with sound accounting principles throughout the periods covered, except as disclosed therein. Neither Borrower nor Guarantor has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower or Guarantor, as applicable, and reasonably likely to have a materially adverse effect on the Property or the operation thereof or Borrower's or Guarantor's ability to fulfill their respective obligations under the Loan Documents, except as referred to or reflected in said financial statements.  Since the date of the financial statements,

there has been no material adverse change in the financial condition, operations or business of Borrower, Guarantor or the Property from that set forth in said financial statements.

       **3.1.11** **Condemnation**.    No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

       **3.1.12** **Utilities and Public Access**.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  The Property has, or is served by, parking to the extent required to comply with all Leases and all Legal Requirements.

       **3.1.13** **Separate Lots**.  The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

       **3.1.14** **Assessments**.    There are no pending or, to the best of Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to the best of Borrower's knowledge, are there any contemplated improvements to the Property that may result in such special or other assessments.

       **3.1.15** **Enforceability**.  The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)), and Borrower has not asserted any right of rescission, set off, counterclaim or defense with respect thereto.

       **3.1.16** **Assignment of Leases**.    The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

       **3.1.17** **Insurance**.  Borrower has obtained and has delivered to Lender original or certified copies of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

       **3.1.18** **Licenses**.    All permits and approvals, including without limitation, certificates of occupancy required by any Governmental Authority for the use, occupancy and operation of the Property in the manner in which the Property is currently being used, occupied and operated have been obtained and are in full force and effect.

**3.1.19  Flood Zone**.  None of the Improvements on the Property is located in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

**3.1.20  Physical Condition**.  Except as set forth in the Property Condition Assessment Report, dated January 7, 2013, prepared by AEI Consultants as Project No. 315347 (the "Property Condition Report"), to the best of Borrower's knowledge, the Property, including, without limitation, all buildings, improvements, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors and all structural components, are in good condition, order and repair in all material respects; except as set forth in the Property Condition Report, to the best of Borrower's knowledge, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

**3.1.21  Boundaries**.  All of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance.

**3.1.22  Leases**.  Borrower represents and warrants to Lender with respect to the Leases that, except as set forth in the tenant estoppel letters delivered to Lender in connection with the Loan: (a) the rent roll attached hereto as Schedule I is true, complete and correct and the Property is not subject to any Leases other than the Leases described in Schedule I, (b) the Leases identified on Schedule I are in full force and effect, to the best of Borrower's knowledge, there are no defaults thereunder by either party and no Tenant is subject to an action under any state or federal bankruptcy, insolvency, or similar laws or regulations, (c) the copies of the Leases delivered to Lender are true and complete and there are no oral agreements with respect thereto, (d) no Rent (including security deposits) has been paid more than one (1) month in advance of its due date, (e) all work to be performed by Borrower under each Lease either has been performed or is being performed as required, (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant has already been received by such Tenant, (g)  all security deposits are being held in accordance with Legal Requirements, (h) all Tenants at the Property as of the date hereof are in physical occupancy of the premises demised under their Leases, are paying full rent under their Leases and have not exercised any right to "go dark" that they may have under the provisions of their Leases; and (i) no Tenant has a purchase option or right of first refusal with respect to the voluntary or involuntary sale of the Property.

**3.1.23  Filing and Recording Taxes**.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or

other similar tax required to be paid under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the title insurance policy to be issued in connection with the Mortgage.

        3.1.24  **Single Purpose**.  Borrower hereby represents and warrants that as of the formation of Borrower and each SPC Party through and including the closing of the Loan on the date hereof that neither Borrower nor any SPC Party has taken any of the actions prohibited (or failed to take any of the actions required to be taken) pursuant to the terms and provisions of this Section 3.1.24.  Borrower hereby represents and warrants to, and covenants that as of the date hereof and until such time as the Debt shall be paid in full:

        (a)     Borrower does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

        (b)     Borrower has not and will not engage in any business other than the ownership, management and operation of the Property and Borrower has and will conduct and operate its business as presently conducted and operated.

        (c)     Except for capital contributions and distributions, Borrower has not and will not enter into any transaction with any Affiliate of Borrower, except upon commercially reasonable terms and conditions that are substantially similar to those that would be available on an arms-length basis with unaffiliated third parties.

        (d)     (i)  Except with respect to the Prior Mortgage Loan, Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and/or (C) Permitted Equipment Leases; provided however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time four percent (4%) of the outstanding principal amount of the Debt.  The restrictions set forth in this subsection (d) shall not be intended to restrict the ability of the Guarantor to obtain loans secured by capital commitments, the proceeds of which are advanced to Borrower.

        (ii)  The Prior Mortgage Loan encumbered no property or other collateral other than the Property and from and after the assignment of the mortgage relating to the Prior Mortgage Loan to Lender, all outstanding obligations of Borrower and any SPC Party to the lender under the Prior Mortgage Loan have been satisfied in full.

(e)     Borrower has not made and will not make or permit to remain outstanding any loans or advances to any third party (including any Affiliate), and has not and shall not own or acquire obligations, stock or securities of its Affiliates.

(f)     Borrower is and will remain solvent and Borrower has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; provided, that, in each such case, there exists sufficient cash flow from the Property to do so; further provided, that nothing herein shall require the Member (as hereinafter defined) to make any additional capital contributions to Borrower.

(g)     Borrower has done or caused to be done and will do or cause to be done all things reasonably necessary to observe organizational formalities and preserve its separate existence, and Borrower will not, nor will Borrower amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower without the prior consent of Lender in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Lender's consent.

(h)     Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party.  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet.  Borrower has filed and will file its own tax returns except to the extent that Borrower is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, and will pay any taxes required to be paid under applicable law.  Borrower has maintained and will maintain its books, records, resolutions and agreements as official records.

(i)     Borrower has been and will be, and at all times has and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower), has and shall correct any known misunderstanding regarding its status as a separate entity, has and shall conduct business in its own name, has not and shall not identify itself or any of its Affiliates as a division or part of any Person and has and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Borrower has and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided that there exists sufficient cash flow from the Property to do so and provided further that the foregoing shall not require its members to make any additional capital contributions to the Borrower).

(k)     To the fullest extent permitted by law, neither Borrower nor any constituent party has or will seek or effect the liquidation, dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of Borrower or transfer all or substantially all of its assets.

(l)     Borrower has not and will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and has and will hold all of its assets in its own name.

(m)     Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     Borrower has not and will not guarantee or become obligated for the debts of any other Person and has not and will not hold itself out to be responsible for or hold out its credit as being available to satisfy the debts or obligations of any other Person.

(o)     Intentionally omitted.

(p)     Other than the members of Borrower, Borrower has not permitted, and will not permit any Affiliate or constituent party independent access to its bank accounts other than the Property Manager acting in such capacity pursuant to the Property Management Agreement.

(q)     Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds.

(r)     Borrower has compensated and shall compensate each of its consultants from its funds for services provided to it and has paid and shall pay from its own assets all obligations of any kind incurred.

(s)     Borrower will not, without the unanimous consent of all of its directors or members, take any Material Action.

(t)     Intentionally omitted.

(u)     Borrower will not pledge its assets to secure the obligations of any other Person.

(v)     Borrower will have no obligation to indemnify its officers, directors, members or partners, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(w)     Borrower does not, and will not have any of its obligations guaranteed by any Affiliate and does not and will not permit any Affiliate to hold such Affiliate's credit out as available to pay the debts of Borrower or pay the debts of Borrower, other than with respect to the Guaranty and Environmental Indemnity.

(x)     Borrower shall not buy or hold evidence of indebtedness issued by any other Person (other than cash or investment-grade securities); and

(y)     Borrower shall not form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity.

(z)     Intentionally omitted;

(aa)     Borrower shall cause the Directors, Officers and other representatives of the Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of the Borrower.

(bb)     If Borrower is a limited partnership or a limited liability company (other than an Acceptable Delaware LLC), each general partner or managing member (each, an "SPC Party") shall be a corporation or limited liability company (I) whose sole asset is its interest in Borrower, (II) which has not been and shall not be permitted to engage in any business or activity other than owning an interest in Borrower; (III) which has not been and shall not be permitted to incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (IV) which has and will at all times own at least a 0.5% direct equity ownership interest in Borrower.  Each such SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 (to the extent applicable) as if such representation, warranty or covenant was made directly by such SPC Party.  Upon the withdrawal or the disassociation of an SPC Party from Borrower, Borrower shall immediately appoint a new SPC Party whose articles of incorporation or organization are substantially similar to those of such SPC Party.

(cc)     (i)  In the event Borrower or the SPC Party is an Acceptable Delaware LLC, the limited liability company agreement of Borrower or the SPC Party (as applicable) (the "LLC Agreement") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or the SPC Party (as applicable) ("Member") to cease to be the member of Borrower or the SPC Party (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or the SPC Party (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or the SPC Party (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), the Springing Member of Borrower or the SPC Party (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or the SPC Party (as applicable) automatically be admitted to Borrower or the SPC Party (as applicable) as a member with a 0% economic interest ("Springing Member") and shall continue Borrower or the SPC Party (as applicable) without dissolution and (ii) Springing Member may not resign from Borrower or the SPC Party (as applicable) or transfer its rights as Springing Member unless a successor Springing Member has been admitted to Borrower or the SPC Party (as applicable) as a Springing Member in accordance with requirements of Delaware.  The LLC Agreement shall further provide that (i) Springing Member shall automatically cease to be a member of Borrower or the SPC Party (as applicable) upon the admission to Borrower or the SPC Party (as applicable) of the first substitute member,

(ii) Springing Member shall be a member of Borrower or the SPC Party (as applicable) that has no interest in the profits, losses and capital of Borrower or the SPC Party (as applicable) and has no right to receive any distributions of the assets of Borrower or the SPC Party (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "Act"), Springing Member shall not be required to make any capital contributions to Borrower or the SPC Party (as applicable) and shall not receive a limited liability company interest in Borrower or the SPC Party (as applicable), (iv) Springing Member, in its capacity as Springing Member, may not bind Borrower or the SPC Party (as applicable) and (v) except as required by any mandatory provision of the Act, Springing Member, in its capacity as Springing Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or the SPC Party (as applicable) including, without limitation, the merger, consolidation or conversion of Borrower or the SPC Party (as applicable).  In order to implement the admission to Borrower or the SPC Party (as applicable) of Springing Member, Springing Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower or the SPC Party (as applicable) as Springing Member, Springing Member shall not be a member of Borrower or the SPC Party (as applicable).

(ii)   The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or the SPC Party (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or the SPC Party (as applicable) agree in writing (A) to continue Borrower or the SPC Party (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or the SPC Party (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or the SPC Party (as applicable), (ii) any action initiated by or brought against Member or Springing Member under any Creditors Rights Laws shall not cause Member or Springing Member to cease to be a member of Borrower or the SPC Party (as applicable) and upon the occurrence of such an event, the business of Borrower or the SPC Party (as applicable) shall continue without dissolution and (iii) each of Member and Springing Member waives any right it might have to agree in writing to dissolve Borrower or the SPC Party (as applicable) upon the occurrence of any action initiated by or brought against Member or Springing Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Springing Member to cease to be a member of Borrower or the SPC Party (as applicable).

(dd)   Intentionally omitted.

(ee)   Intentionally omitted.

(ff)   Not later than 120 days after and as of the end of each fiscal year and at any other time upon request from Lender, Borrower shall provide an Officer's Certificate certifying as to Borrower's continued compliance with the terms of this Section 3.1.24 and the terms of the Cash Management Agreement if at such time the Officer's Certificate is being delivered the Cash Management Agreement has been executed by the parties thereto.  Additionally, Borrower shall provide Lender with such other reasonable evidence of Borrower's

compliance with this <u>Section 3.1.24</u>, and the terms of the Cash Management Agreement (if at such time the Cash Management Agreement has been executed by the parties thereto) as Lender may reasonably request from time to time.

**3.1.25  <u>Tax Filings</u>**.  To the extent required, Borrower has timely filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.  Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**3.1.26  <u>Solvency</u>**.  Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**3.1.27  <u>Federal Reserve Regulations</u>**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**3.1.28  <u>Organizational Chart</u>**.  The organizational chart attached as <u>Schedule III</u> hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

**3.1.29  <u>Bank Holding Company</u>**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**3.1.30  <u>Investment Company Act</u>**.  Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary

company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

       **3.1.31**   **No Bankruptcy Filing**.   Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any knowledge of any Person contemplating the filing of any such petition against it.

       **3.1.32**   **Full and Accurate Disclosure**.   To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.   There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

       **3.1.33**   **Foreign Person**.   Borrower is not a "foreign person" within the meaning of Section 1445(t)(3) of the Code.

       **3.1.34**   **No Change in Facts or Circumstances; Disclosure**.   To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

       **3.1.35**   **Management Agreement**.   The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.   The Management Agreement was entered into on commercially reasonable terms.

       **3.1.36**   **Perfection of Accounts**.   Borrower hereby represents and warrants to Lender that:

       (a)   This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Accounts (as defined in the Cash Management Agreement) in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.   Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Accounts;

       (b)   The Accounts constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code.

**3.1.37** <u>**No Breach of Fiduciary Duty**</u>.  No Person currently owning a direct or indirect equity ownership interest in Borrower (nor any past or current affiliate of such Person), has breached any fiduciary duty owed by such Person to any other Person now or previously owning a direct or indirect equity ownership interest in Borrower or any prior owner of the Property.

**3.1.38** <u>**Intentionally Omitted**</u>

**3.1.39** <u>**Illegal Activity/Forfeiture**</u>

(a)    No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)    There has not been and shall never be committed by Borrower or any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Mortgage, or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

**3.1.40** <u>**Guarantor Representations**</u>.  Borrower hereby represents and warrants that, as of the date hereof and continuing thereafter for the term of the Loan, the representations and warranties set forth in <u>Sections 3.1.2</u> through <u>3.1.6</u>, <u>3.1.8</u>, <u>3.1.9</u>, <u>3.1.10</u>, <u>3.1.25</u>, <u>3.1.26</u>, <u>3.1.31</u> through <u>3.1.34</u>, and <u>3.1.37</u> above are true and correct with respect to Guarantor.  With respect to this <u>Section 3.1.40</u> only, wherever the term "Borrower" is used in each of the foregoing Subsections it shall be deemed to be "Guarantor".

**Section 3.2**    **Survival of Representations**.  The representations and warranties set forth in <u>Section 3.1</u> shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## IV.    BORROWER COVENANTS

**Section 4.1**    **Borrower Affirmative Covenants**.  Borrower hereby covenants and agrees with Lender that:

**4.1.1** <u>**Existence; Compliance with Legal Requirements**</u>.  Borrower and Guarantor shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it and the Property, including, without limitation, Prescribed Laws.

**4.1.2** <u>**Taxes and Other Charges**</u>.  Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of

Section 6.2 hereof.  Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent; provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 6.2 hereof.  Borrower shall not permit or suffer and shall promptly discharge (by bonding or in such other manner acceptable to Lender in its sole discretion) any lien or charge against the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) Borrower shall deposit with Lender cash, or other security as may be approved by Lender, in an amount equal to one hundred twenty-five percent (125%) of the contested amount, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established. Notwithstanding the foregoing, Borrower shall have the right to bring tax certiorari proceedings regarding the adjustment of tax assessment with respect to the Property in the normal course of business without being required to comply with clauses (i) through (vi) of the immediately preceding sentence provided that Taxes shall continue to be paid as provided in this Agreement.

      **4.1.3**   **Litigation**.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which might materially adversely affect the Property or Borrower's ability to perform its obligations hereunder or under the other Loan Documents.

      **4.1.4**   **Access to Property**.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

      **4.1.5**   **Further Assurances; Supplemental Mortgage Affidavits**.  Borrower shall, at Borrower's sole cost and expense:

      (a)   execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

      (b)   do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

**4.1.6   Financial Reporting**.  (a)  Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with tax basis accounting standards, reflecting the financial affairs of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to Borrower to examine such books and records at the office, of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.

(b)     Borrower shall furnish Lender annually, within 120 days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements reviewed by a "Big Four" accounting firm or other independent certified public accountant acceptable to Lender (DHS & Company, Inc., is hereby approved by Lender as Borrower's certified public accountant, and Borrower hereby represents and warrants that DHS & Company, Inc., is not an Affiliate of Borrower) ("Approved Accountant") and prepared in accordance with GAAP covering the Property, including statements of income and expense and cash flow for Borrower and the Property and balance sheets for Borrower.  Such statements shall set forth Underwritten NOI, Gross Revenue and Operating Expenses for the Property and in the case of Guarantor, Guarantor's Net Worth and Liquidity.  Borrower's annual financial statements shall be accompanied by a certificate executed by the chief financial officer of Borrower stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property in all material respects.  Together with Borrower's annual financial statements, Borrower shall furnish to Lender (i) an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same, and (ii) the Officer's Certificate described in Section 3.1.24(w).

(c)     Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year) the following items, accompanied by certificate from the chief financial officer or other authorized senior officer of Borrower, certifying that such items are true, correct, accurate and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with tax basis accounting standards as applicable:

(i)     quarterly and year-to-date statements of income and expense and cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower;

(ii)     a current rent roll for the Property in the form attached hereto as Schedule I;

(iii)     upon request of Lender at any time, a comparison of the budgeted income and expenses and the actual income and expenses for any quarter after the date hereof and year to date for the Property, together with a reasonably detailed explanation of any variances of more than ten percent (10%) between budgeted and actual amounts for such period and year to date;

(iv) if there are any Leases in place during the applicable reporting period, a summary report containing each of the following with respect to the Property for the most recently completed calendar year: (A) aggregate sales by tenants under Leases or other occupants of the Property, both on an actual (but only to the extent such information is required to be provided by tenants under their respective Leases and such tenants provide such information after Borrower's request therefor) and, to the extent made available to Borrower by any tenant, on a comparable store basis, (B) rent per square foot payable by each tenant and (C) aggregate occupancy of the Property as of December 31; and

(v) at any time that any leasable space at the Property is not fully leased, a lease marketing and activity report in form reasonably satisfactory to Lender.

(d) Prior to the last Securitization of any portion of the Loan and upon request by Lender, Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each calendar month, the following items, accompanied by a certificate from the chief financial officer of Borrower, certifying that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in a manner consistent with tax basis accounting standards, as applicable:

(i) monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property; and

(ii) a current rent roll for the Property.

(e) Borrower shall submit the Annual Budget to Lender not later than thirty (30) days prior to the commencement of each Fiscal Year.  In the event that Borrower incurs an extraordinary operating expense or extraordinary capital expenditure not set forth in the Annual Budget (each, an "Extraordinary Expense"), then Borrower shall provide a reasonably detailed explanation of such Extraordinary Expense on or before the date upon which Borrower's next quarterly financial reporting is due to Lender pursuant to clause (c) above. Notwithstanding anything to the contrary contained in this Agreement, during the continuance of a Cash Management Sweep Period, Lender shall have the right to approve the Annual Budget.

(f) Borrower shall furnish to Lender any notice received from a Tenant threatening non-payment of Rent or other material default, alleging or acknowledging a material default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject fiscal quarter.

(g) Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender, including, without limitation, a comparison of the budgeted income and expenses and the actual income and expenses for a quarter and year to date for the

Property, together with a detailed explanation of any variances of more than the greater of ten percent (10%) between budgeted and actual amounts for such period and year to date; and

(h)     Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 4.1.6 (each, a "Required Financial Item" and collectively, the "Required Financial Items").  In the event Borrower fails to deliver to Lender any of the Required Financial Items within the time frame specified herein (each such event, a "Reporting Failure"), in addition to constituting a default hereunder and without limiting Lender's other rights and remedies with respect to the occurrence of such a default, Borrower shall pay to Lender the sum of $2,500 per occurrence for each Reporting Failure if Borrower shall not correct such failure within five (5) Business Days of written notice of the same. Notwithstanding the foregoing, Lender shall waive the fee with respect to the first Reporting Failure in any calendar year, provided, that, such fee for Reporting Failures shall not be waived more than two times during the term of the Loan, and further provided that, if any Reporting Failure lasts for more than fifteen (15) Business Days, the $2,500 fee shall not be waived.  It shall constitute a further Event of Default hereunder if any such payment is not received by Lender within thirty (30) days of the date on which such payment is due, and Lender shall be entitled to the exercise of all of its rights and remedies provided hereunder.

(i)     Borrower shall deliver (or caused to be delivered) financial information relating to Guarantor as required pursuant to the terms and provisions of each Guaranty.

(j)     Borrower shall promptly give Lender written notice of any failure of any Tenant, after initial occupancy, to be in full occupancy of its respective space and continuously open and operating for business therein, except to the extent any such closure is permitted pursuant to the terms and provisions of the applicable Lease (and in no event, shall such notice be given more than seven (7) Business Days after Borrower's knowledge of the same).

4.1.7   **Title to the Property**.  Borrower will warrant and defend the validity and priority of the Liens of the Mortgage and the Assignment of Leases on the Property against the claims of all Persons whomsoever, subject only to Permitted Encumbrances.

4.1.8   **Estoppel Statement**.  (a)  After request by Lender, Borrower shall within seven (7) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

(b)     After request by Borrower, Lender shall within seven (7) Business Days furnish Borrower with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Interest Rate of the Note, (iii) the date installments of interest and/or  principal were last paid and (iv) whether or not Lender has sent any notice of default under the Loan Documents which remains uncured in the opinion of Lender.

(c)     Borrower shall use its best efforts to deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease (provided that Borrower shall only be

required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease, as applicable); provided that such certificate may be in the form required under such Lease; provided, further, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year (other than in connection with an Event of Default or a Securitization).

        **4.1.9** **Leases**.   (a)   Notwithstanding the foregoing, all Leases and all discretionary renewals, discretionary extensions, material amendments and material modifications of any Lease entered into after the date hereof and all discretionary terminations, surrenders, reductions in the demised premises or reductions in rent or other recoveries in connection with any Lease existing as of the date hereof (an "Existing Lease Action") shall also be subject to Lender's prior approval, which approval shall not be unreasonably withheld or delayed so long as no Event of Default is continuing.  Prior to seeking Lender's approval of any Lease or any renewals, extensions, amendments and modifications of any Lease or any Existing Lease Action, Borrower shall deliver to Lender a copy of any documentation proposed to be entered into in connection therewith, including, if applicable, a blackline against the Borrower's form of Lease approved by Lender if Borrower's form of Lease is used (each, a "Proposed Lease Document").  Borrower shall not be required to use Borrower's form of Lease.

        (b)   Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; provided, however, Borrower shall not terminate or accept a surrender of a Lease without Lender's prior approval (provided that the foregoing will not restrict the ability of a Tenant under a Lease to terminate such Lease pursuant to express provisions of such Lease if such Lease is in effect on the date hereof or otherwise has been approved by Lender as provided herein); (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements.  Upon request, Borrower shall furnish Lender with executed copies of all Leases.

        (c)   Borrower agrees to promptly furnish to Lender all material written correspondence received from Tenants concerning existing Leases, and notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan.  Borrower further agrees to provide Lender with written notice of a Tenant "going dark" under such Tenant's Lease within thirty (30) calendar days after such Tenant "goes dark" and Borrower's failure to provide such notice shall constitute an Event of Default.

        (d)   Borrower shall notify Lender in writing, within five (5) Business Days following receipt thereof, of Borrower's receipt of any Lease Termination Fee paid by any

Tenant under any Lease, and Borrower further covenants and agrees that Borrower shall deposit such Lease Termination Fee with Lender in accordance with Section 6.6 hereof.

(e)  Notwithstanding anything to the contrary contained in this Section 4.1.9:

(i)  whenever Lender's approval or consent is required pursuant to the provisions of this Section 4.1.9, Borrower shall submit each Proposed Lease Document to Lender along with a request for Lender's approval.  Lender shall use good faith efforts to respond within ten (10) Business Days after Lender's receipt of Borrower's written request for approval of or consent to such Proposed Lease Document.  Lender's consent pursuant to this Section shall be deemed withheld absent notice from Lender to the contrary unless within ten (10) days of such request Lender has not responded (either affirmatively or negatively) and thereafter Borrower sends a second request to Lender with the following legend on such request in bold face type and in not less than fourteen (14) point font: **"THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT BETWEEN MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC AND 262 EAST FORDHAM REALTY LLC, FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) DAYS WILL RESULT IN THIS REQUEST BEING DEEMED GRANTED."**  If, within ten (10) days of delivery of the second notice as aforesaid Lender has not responded (affirmatively or negatively) to Borrower, such request shall be deemed granted;

(ii)  whenever Lender's approval or consent is required pursuant to the provisions of this Section 4.1.9, Borrower shall have the right to submit a term sheet, letter of intent or interim draft of such transaction to Lender for Lender's approval, such approval not to be unreasonably withheld or delayed.  Any such term sheet, letter of intent or interim draft submitted to Lender shall set forth all material terms of the proposed transaction including, without limitation, identity of tenant, square footage, term, rent, rent credits, abatements, work allowances and tenant improvements to be constructed by Borrower.  Lender shall use good faith efforts to respond within ten (10) Business Days after Lender's receipt of Borrower's written request for such approval or consent.  Lender's consent pursuant to this Section shall be deemed withheld absent notice from Lender to the contrary unless within ten (10) days of such request Lender has not responded (either affirmatively or negatively) and thereafter Borrower sends a second request to Lender with the following legend on such request in bold face type and in not less than fourteen (14) point font: **"THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT BETWEEN MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC AND 262 EAST FORDHAM REALTY LLC.  FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) DAYS WILL RESULT IN THIS REQUEST BEING DEEMED GRANTED."**  If, within ten (10) days of delivery of the second notice as aforesaid Lender has not responded (affirmatively or negatively) to Borrower, such request shall be deemed granted;

(iii)  whenever Lender's approval or consent is required pursuant to the provisions of this Section 4.1.9 for a Lease or an Existing Lease Action and additional material and/or adverse terms have been added to a term sheet, letter of intent, interim

draft or Proposed Lease Document that Lender has already approved, Borrower shall be required to obtain Lender's approval of such additional material and/or adverse terms. Lender shall use good faith efforts to respond within ten (10) Business Days after Lender's receipt of Borrower's written request for such approval or consent.  Lender's consent pursuant to this Section shall be deemed withheld absent notice from Lender to the contrary unless within ten (10) days of such request Lender has not responded (either affirmatively or negatively) and thereafter Borrower sends a second request to Lender with the following legend on such request in bold face type and in not less than fourteen (14) point font: **"THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT BETWEEN MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC AND 262 EAST FORDHAM REALTY LLC.  FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) DAYS WILL RESULT IN THIS REQUEST BEING DEEMED GRANTED."**  If, within ten (l0) days of delivery of the second notice as aforesaid Lender has not responded (affirmatively or negatively) to Borrower, such request shall be deemed granted;

        (iv)     whenever Lender's approval or consent is requested for a final Lease or a final Existing Lease Action that Lender has previously approved pursuant to Section 4.1.9(e)(i), (ii)or (iii) above, Lender shall use good faith efforts to respond within FIVE (5) Business Days after Lender's receipt of Borrower's written request for such approval or consent.  Lender's consent pursuant to this Section shall be deemed withheld absent notice from Lender to the contrary unless within Five (5) days of such request Lender has not responded (either affirmatively or negatively) and thereafter Borrower sends a second request to Lender with the following legend on such request in bold face type and in not less than fourteen (14) point font: **"THIS IS A REQUEST FOR CONSENT UNDER THE UNDER THE LOAN AGREEMENT BETWEEN MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC AND 262 EAST FORDHAM REALTY LLC. FAILURE TO RESPOND TO THIS REQUEST WITHIN FIVE (5) DAYS WILL RESULT IN THIS REQUEST BEING DEEMED GRANTED."** If, within five (5) days of delivery of the second notice as aforesaid Lender has not responded affirmatively or negatively) to Borrower, such request shall be deemed granted, provided that there have been no material deviations from the term sheet or Proposed Lease Document, as the case may be, and that the aggregate economics of the transaction are no less favorable to Borrower than as set forth in the term sheet or Proposed Lease Document that had been approved;

        (v)     in the event that Lender shall have approved (or be deemed to have approved) a term sheet or Proposed Lease Document submitted by Borrower with respect to a certain Lease, Lender shall not withhold its approval or consent with respect to such Lease on the basis of any provisions of such Lease dealing with the items contained in the approved term sheet or Proposed Lease Document; and

        (vi)     Intentionally omitted.

        (vii)     Any notice delivered to Lender pursuant to this Section 4.1.9 must be delivered in accordance with Section 11.6, provided, that, there shall not be any

"deemed" receipt and all time frames for response to requests for Lender's consent under this <u>Section 4.1.9</u> shall be based on the date of Lender's actual receipt of the request.

(f)     Borrower shall complete all tenant improvements at the Property required pursuant to any Leases in a good and workmanlike manner in the time periods specified in the applicable Lease.  Upon the completion of any tenant improvements, Borrower shall deliver to Lender (i) a certificate from Borrower (A) stating that all such tenant improvements have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with such tenant improvements, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded or reimbursed by the requested disbursement, and (C) lien waivers (or conditional lien waivers, if the disbursement is made jointly to Borrower and a third party, as provided below) or other evidence of payment reasonably satisfactory to Lender, (ii) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (iii) Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property shall have been completed.

(g)     Any commission or brokerage agreement in respect of which Borrower is obligated to pay or reimburse leasing commissions in connection with Leases shall be commercially reasonable terms and approved by Lender, which approval shall be granted in Lender's reasonable discretion, provided the leasing commissions contained in the Management Agreement as of the date hereof are hereby approved; provided, however, the timing of the payment of any such leasing commissions shall be approved by Lender, which approval shall be granted in Lender's reasonable discretion, in conjunction with the approval of the related Lease.

**4.1.10  <u>Alterations</u>**.  Lender's prior approval shall be required in connection with any alterations to any Improvements (i) that may have a Material Adverse Effect, (ii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold or (iii) that are structural in nature, which approval may be granted or withheld in Lender's sole discretion, except that Lender's approval will be reasonable with respect to (ii) above.  Notwithstanding the foregoing, tenant improvements under any Lease existing as of the date hereof or any Lease hereafter approved or deemed approved by Lender shall not require Lender's prior written approval.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) Letters of Credit, (iii) U.S. Obligations, (iv) other securities acceptable to Lender, provided that Lender shall have approved the same in its reasonable discretion, or (v) a completion bond, provided that Lender shall have approved such bond as to the form and issuer of same, in its reasonable discretion.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold.  If cash shall have been delivered to Lender as security in connection with any such alteration to the Improvements, then upon Borrower's written request, Lender shall no more than once per calendar month prior to the completion of

such alterations, release the a portion of the cash deposited with Lender in an amount equal to Borrower's actual out-of-pocket expenditures in excess of the Alteration Threshold directly to pay the costs of such alterations (provided Borrower provides Lender with reasonable evidence of the completion of the portion of the alteration relating to such payment) so long as there shall remain sufficient cash deposited with Lender pursuant to the terms and provisions of this Section 4.1.10 for such alteration that, in Lender's reasonable estimation, to complete the lien-free construction of such alteration in a good and workmanlike manner and in compliance with the plans and specification approved by Lender in accordance with the terms and provisions hereof. Lender shall use good faith efforts to respond within thirty (30) days after Lender's receipt of Borrower's written request for approval or consent pursuant to this Section 4.1.10.  Lender's consent pursuant to this Section shall be deemed withheld absent notice from Lender to the contrary unless within thirty (30) days of such request Lender has not responded (either affirmatively or negatively) and thereafter Borrower sends a second request to Lender with the following legend on such request in bold face type and in not less than fourteen (14) point font: **"THIS IS A REQUEST FOR CONSENT UNDER THE LOAN AGREEMENT BETWEEN MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC AND 262 EAST FORDHAM REALTY LLC.  FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) DAYS WILL RESULT IN THIS REQUEST BEING DEEMED GRANTED."** If, within ten (10) days of delivery of the second notice as aforesaid Lender has not responded (affirmatively or negatively) to Borrower, such request for consent under this Section 4.1.10 shall be deemed granted.

### 4.1.11   Intentionally Omitted.

**4.1.12   Material Agreements.**   Borrower shall (a) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under each Material Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any written notice of any material default by any party under any Material Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Material Agreement to which it is a party in a commercially reasonable manner.

**4.1.13   Performance by Borrower.**   Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

**4.1.14   Costs of Enforcement/Remedying Defaults.**   In the event (a) that the Mortgage is foreclosed in whole or in part or the Note or any other Loan Document is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any Lien or Mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or an assignment by Borrower or Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all costs incurred by Lender as a result

thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes.

**4.1.15** **Business and Operations**.  Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and leasing of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership and leasing of the Property.  Subject to any work or alterations being performed at the Property, Borrower shall at all times, unless otherwise consented to in writing by Lender, cause the Property Floors to be maintained and leased as retail space.

**4.1.16** **Intentionally Omitted**.

**4.1.17** **Intentionally Omitted**.

**4.1.18** **Intentionally Omitted**.

**4.1.19** **Maintenance of Property**.  Borrower shall cause the Property to be maintained in good and safe working order and repair, reasonable wear and tear excepted, and in keeping with the condition and repair of properties of a similar use, value, age, nature and construction.  Borrower shall not use, maintain or operate the Property in any manner that constitutes a public or private nuisance or that makes void, voidable, or cancelable, or increases the premium of, any insurance then in force with respect thereto.  Borrower shall from time to time make, or cause to be made, all reasonably necessary repairs and replacements to the Property.

**4.1.20** **O&M Plan**.  Borrower shall at all times comply with the terms and provisions of each O&M Plan and all local, state and federal laws regulating or otherwise addressing asbestos or asbestos-containing materials.

**4.1.21** **Required Repairs**.  Borrower shall perform the repairs at the Property as set forth on Schedule II hereto (such repairs hereinafter referred to as "Required Repairs").  Borrower shall commence each of the Required Repairs on or before the date which is six (6) months from the date hereof and complete each of the Required Repairs on or before the date which is twelve (12) months from the date hereof and, upon the request of Lender, shall provide Lender with evidence reasonably satisfactory to Lender of such commencement or completion.

**Section 4.2**     **Borrower Negative Covenants**.  Borrower covenants and agrees with Lender that:

**4.2.1** **Due on Sale and Encumbrance; Transfers of Interests**.

(a)     Without the prior written consent of Lender, neither Borrower nor any other Person having a direct or indirect ownership or beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or

indirect, in a Restricted Party, the Property or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage and this Agreement (collectively, "Prohibited Transfer").  The provisions of this Section 4.2 shall be subject to Borrower's rights under Article VIII hereof.

(b)     A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement pursuant to which Borrower sells the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 7.4; and (viii) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower or by any other person or entity, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law).

**4.2.2   Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property except for Permitted Encumbrances.

**4.2.3   Dissolution**.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iii) cause, permit or suffer any SPC Party to (A) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which such SPC Party would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation or bylaws of such SPC Party, in each case without obtaining the prior consent of Lender.

**4.2.4   Change in Business**.  Borrower shall not enter into any line of business or business activity other than the ownership and operation of the Property.

**4.2.5   Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to

Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

### 4.2.6   <u>Intentionally Omitted</u>.

### 4.2.7   <u>Zoning</u>.   Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

### 4.2.8   <u>Intentionally omitted</u>.

### 4.2.9   <u>No Joint Assessment</u>.   Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

### 4.2.10   <u>Principal Place of Business</u>.   Borrower shall not (i) change its principal place of business or name from the address and name set forth in the introductory paragraph hereof without, in each instance, (A) giving Lender thirty (30) days' prior notice and (B) taking all action required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents or (ii) except as otherwise specifically provided in <u>Section 8.2</u> hereof, change its organizational structure without (A) obtaining the prior written consent of Lender and (B) taking all action required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents.  At the request of Lender, Borrower shall execute a certificate in form reasonably satisfactory to Lender listing the trade names under which Borrower intends to operate the Properties, and representing and warranting that Borrower does business under no other trade name with respect to the Properties.

### 4.2.11   <u>ERISA</u>.   (a)  Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>").

(b)      Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (C) one or more of the following circumstances is true:

(i)      Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101 (b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §25l0.3-101(f)(2); or

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §25 10.3-101(c) or (e).

**4.2.12** **Material Agreements**.  Borrower shall not, without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed: (a) enter into, surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party, except as provided therein or on an arms'-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect, except on an arm's-length basis and commercially reasonable terms; provided, however, that, if a Material Agreement is reviewed as a component of any other approval required under the Loan Documents (including, but not limited to, approvals for alterations pursuant to <u>Section 4.1.10</u> hereof), Borrower shall not be required to get consent to such Material Agreement pursuant to this <u>Section 4.2.12</u>.

## V.     INSURANCE, CASUALTY AND CONDEMNATION[1]

### Section 5.1    Insurance

**5.1.1** **Insurance Policies**.  (a)  Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)     comprehensive all risk insurance on the Improvements and the personal property at the Property, including fire, lightning, vandalism and malicious mischief, boiler and machinery, contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements ("<u>L&O Coverage</u>"), and if required by Lender, flood and/or earthquake coverage, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation provided that (i) the L&O Coverage may be limited to $10,000,000 for any single loss for Coverages B & C, and (ii) the all risk insurance may be subject to a deductible of up to $100,000; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible for all such insurance coverage in excess of such amount as may be reasonably determined by Lender based on then existing insurance market conditions for similar properties in the New York City area; and (D)

---

[1] Under review by Morgan Stanley's insurance consultant.

containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses.  In addition, Borrower shall obtain: (y) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of the Note or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity or as reasonable required by Lender, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i).

(ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit, excluding umbrella coverage, of not less than One Million and No/100 Dollars ($1,000,000) per occurrence and Two Million and No/100 Dollars ($2,000,000) in the aggregate; (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Article 9 of the Mortgage to the extent the same is available;

(iii)     business interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above for a period commencing at the time of loss for such length of time as it takes to repair or replace damage to the Property with the exercise of due diligence and dispatch; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected net income (plus coverage for any expenses that will continue after the Casualty) from the Property for a period from the date of loss to a date (assuming total destruction) which is six (6) months from the date that the Property is repaired or replaced and operations are resumed.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding eighteen (18) month period.  All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied

to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     at all times during which structural construction, repairs or alterations (including, without limitation, the Pre-Approved Alteration) are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) Coverage is accordance with above mentioned commercial general liability insurance policy; and (i) provide XCU coverage with regard to construction project; (ii) include three (3) years extended completed operations coverage, after completion of the Project; and (B) the insurance provided for in subsection (i) above written .in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) limits equivalent to 100% of the hard costs and soft costs for all recurring expenses in the event of damage or destruction;

(v)     workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000) for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     umbrella liability insurance in addition to primary coverage in an amount not less than Twenty-Five Million and No/100 Dollars ($25,000,000) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above and (viii) below;

(viii)     motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000);

(ix)     intentionally omitted;

(x)     insurance against employee dishonesty in an amount not less than One Million and No/l00 Dollars ($1,000,000) and with a deductible in such amount as may be reasonably determined by Lender based on then existing insurance market conditions for similar properties in the New York City area;

(xi)     if "acts of terrorism" or other similar acts or events or "fire following" are hereafter excluded from Borrower's comprehensive all risk insurance policy or policies required under Sections 5.1.1(a)(i) and 5.1.1(a)(iii) above, Borrower shall obtain an endorsement to such policy or policies, or a separate policy from an insurance provider which maintains at least an investment grade rating from S&P (that is, "A-") and, if they are rating the Securities and if they rate the insurer from Fitch (that is, "A-") and from Moody's (that is, "Baa3"), insuring against all such excluded acts or events and "fire following," to the extent such policy or endorsement is available, in an amount reasonably determined by Lender in its sole discretion based on then existing insurance market conditions for similar properties in the New York City area (but in no event more than an amount equal to the sum of 150% of the "Full Replacement Cost" and twelve (12) months business interruption insurance), provided, it being agreed that the endorsement or policy shall be in form and substance satisfactory to Lender. Notwithstanding the foregoing, for so long as the Terrorism Risk Insurance Act of 2002, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2007 ("TRIPRA") is in effect (including any extensions or if another federal governmental program is in effect which provides substantially similar protections as TRIPRA), Lender shall accept terrorism insurance which covers against "covered acts" as defined by TRIPRA (or such other program) as full compliance with this Section 5.1.1(a)(xi) as it relates to the risks that are required to be covered, provided TRIPRA continues to cover both domestic and foreign acts of terrorism; and

(xii)     upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)     All insurance provided for in Section 5.1.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy" ) and, to the extent not specified above, shall be subject to the approval of Lender as to deductibles, loss payees and insureds.  Prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy (which may include coverage required under Section 5.1.1(a)(xi) shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1.1 (a).

(d)     All Policies of insurance provided for or contemplated by Section 5.1.1(a) shall be primary coverage and, except for the Policy referenced in Section 5.1.1(a)(v), shall name Borrower as the insured and Lender as the additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood, earthquake and terrorism insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.  Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or

would adversely impact in any way the ability of Lender or Borrower to collect any proceeds under any of the Policies.

(e)     All Policies of insurance provided for in Section 5.1.1(a), except for the Policies referenced in Section 5.1.1(a) (v) and (a)(viii) shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policy shall not be canceled without at least thirty (30) days' written notice to Lender and any other party named therein as an additional insured and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(iii)   Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion in good faith deems reasonably appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage and shall bear interest at the Default Rate.

(g)     In the event of foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

**5.1.2   Insurance Company**.  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "A-" or better by S&P and Fitch and/or an insurance financial strength rating of "A2" by Moody's.  If a Securitization occurs, (i) the foregoing required insurance company rating by a Rating Agency not rating any Securities shall be disregarded and (ii) if the insurance company complies with the aforesaid S&P required rating (and S&P is rating the Securities) and the other Rating Agencies rating the Securities do not rate the insurance company, such insurance company shall be deemed acceptable with respect to such Rating Agency not rating such insurance company.  If a Securitization occurs and S&P is not a Rating Agency, each of the insurance companies shall have a claims paying ability rating of at

least A- by Fitch and an insurance financial strength rating of A3 by Moody's and at least sixty-seven percent (67%) of the coverage shall be provided by insurance companies having claims paying ability ratings of A by Fitch and an insurance financial strength rating of A2 by Moody's; provided, however, if Fitch or Moody's shall not provide a rating for an insurance company, then an A.M.  Best rating of A(X) shall be substituted for each of the foregoing rating requirements of Fitch or Moody's, as applicable.  Notwithstanding the foregoing, Borrower shall be permitted to maintain the Policies with insurance companies which do not meet the foregoing requirements (an "Otherwise Rated Insurer"), provided Borrower obtains a "cut-through" endorsement (that is, an endorsement which permits recovery against the provider of such endorsement) with respect to any Otherwise Rated Insurer from an insurance company which meets the claims paying ability ratings required above.  Moreover, if Borrower desires to maintain insurance required hereunder from an insurance company which does not meet the claims paying ability ratings set forth herein but the parent of such insurance company, which owns at least fifty-one percent (51%) of such insurance company, maintains such ratings, Borrower may use such insurance companies if approved by Lender (such approval may be conditioned on items required by Lender including a requirement that the parent guarantee the obligations of such insurance company).

**Section 5.2    Casualty and Condemnation**

    **5.2.1    Casualty**.  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "Restoration") and otherwise in accordance with Section 5.3, it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance provided that Borrower shall have the rights and obligations with respect to Net Proceeds set forth in Section 5.3.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss does not exceed Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustments.  Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

    **5.2.2    Condemnation**.  Borrower shall give Lender prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all papers served in connection with such proceedings.  Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation; provided that the same is effected in a

commercially reasonable and timely manner.  In the event a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.  Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.3.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

**5.2.3  Casualty  Proceeds**.    Notwithstanding  the  last  sentence  of  Section 5.1.(a)(iii) and provided no Event of Default then exists hereunder, proceeds received by Lender on account of the business interruption insurance specified in Subsection 5.1.1 (a)(iii) above with respect to any Casualty shall be deposited by Lender directly into the Deposit Account (as defined in the Cash Management Agreement) if the Cash Management Agreement has become effective but (a) only to the extent it reflects a replacement for (i) lost Rents that would have been due under Leases existing on the date of such Casualty, and/or (ii) lost Rents under Leases that had not yet been executed and delivered at the time of such Casualty which Borrower has proven to the insurance company would have been due under such Leases (and then only to the extent such proceeds disbursed by the insurance company reflect a replacement for such past due Rents) and (b) only to the extent necessary to fully make disbursements for the payment of Operating Expenses approved by Lender, Debt Service and any required monthly deposits to the Reserve Funds required pursuant to Article VI.

### Section 5.3    Delivery of Net Proceeds

**5.3.1  Minor Casualty or Condemnation**.  .  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided the conditions set forth in Section 5.3.2(a)(i) through (ix) below have been met, the Net Proceeds will be disbursed by Lender to Borrower.  Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

**5.3.2** **Major Casualty or Condemnation**.  (a) If a Casualty or Condemnation has occurred to the Property and the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met:

(i)      no Event of Default shall have occurred and be continuing;

(ii)      (A) in the event the Net Proceeds are insurance proceeds, less than thirty percent (30%) of each of the (i) fair market value of the Property as reasonably determined by Lender and (ii) rentable area of the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (B) in the event the Net Proceeds are an Award, less than fifteen percent (15%) of each of the (i) fair market value of the Property as reasonably determined by Lender and (ii) rentable area of the Property has been taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of the Condemnation;

(iii)      Leases requiring payment of annual rent equal to eighty percent (80%) of the Gross Revenue received by Borrower during the twelve (12) month period immediately preceding the Casualty or Condemnation and all Leases shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration, notwithstanding the occurrence of such Casualty or Condemnation.

(iv)      Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than 120 days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(v)      Lender shall be satisfied that any operating deficits and all payments of principal and interest under the Note will be paid during the period required for Restoration from (A) the Net Proceeds, or (B) other funds of Borrower;

(vi)      Lender shall be satisfied that the Restoration will be substantially completed on or before the earliest to occur of (A) the date six (6) months prior to the Maturity Date, (B) the earliest date required for such completion under the terms of any Lease, (C) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable or (D) the expiration of the insurance coverage referred to in <u>Section 5.l.l(a)(iii)</u>;

(vii)      the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(viii)      the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; and

(ix)     such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the related Improvements.

(b)     The Net Proceeds shall be paid directly to Lender and held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Debt.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (A) all requirements set forth in Section 5.3.2(a) have been satisfied, (B) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (C) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the reasonable satisfaction of Lender by the title company issuing the Title Insurance Policy.

(c)     All plans and specifications required in connection with the Restoration shall be subject to prior approval of Lender and an independent architect selected by Lender (the "Casualty Consultant"), which approval shall not be unreasonably withheld, conditioned or delayed.  The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the Improvements immediately prior to the Casualty or Condemnation (except to the extent construction was in process at the time of the Casualty or Condemnation in which event the Restoration shall be completed to the equivalent of the Improvements immediately prior to commencement of construction and further provided, however, that in the case of a partial Condemnation, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Condemnation), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty.  Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable material Legal Requirements.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval of Lender and the Casualty Consultant, which approval shall not be unreasonably withheld, conditioned or delayed.  All costs and expenses incurred by Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, reasonable attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage.  The term "Casualty Retainage" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs

actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been substantially completed.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been substantially completed in accordance with the provisions of this Section 5.3.2(d) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily and substantially completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the Mortgage and evidence of payment of any premium payable for such endorsement.  If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Debt.

(g)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under any of the Loan Documents; provided, however, the amount of such excess returned to Borrower in the case of a Condemnation shall not exceed the amount of Net Proceeds Deficiency deposited by Borrower with the balance being applied to the Debt in the manner provided for in Subsection 5.3.2(h).

(h)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to <u>Section 5.3.2(g)</u> may be retained and applied by Lender toward the payment of the Debt, whether or not then due and payable, in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate.  Upon payment in full of the Debt, any remaining Net Proceeds shall be paid to Borrower.

(i)     Notwithstanding anything to the contrary set forth in this Agreement, with respect to a Casualty or a Condemnation, for so long as the Loan or any portion thereof is included in a Securitization, if the Loan to Value Ratio (such value to be determined by the Lender in its sole discretion based on a commercially reasonable valuation method using only the portion of the Property which constitutes acceptable real estate collateral under the Code for a REMIC Trust) immediately after such Condemnation or Casualty, as the case may be, and prior to any Restoration (but taking into account any planned Restoration of the Property as if such planned Restoration were completed) is less than one hundred and twenty-five percent (125%), the principal balance of the Loan must be paid down by "qualified amount" as that term is defined in the IRS Revenue Procedure 2010-30, as the same may be amended, modified or supplemented from time to time (and no Yield Maintenance Premium or any other prepayment premium or fee shall be due in connection therewith), in order to meet the foregoing loan-to-value ratio unless Borrower delivers to Lender an opinion of counsel, acceptable to Lender in its reasonable discretion, that if such amount is not paid, such Securitization will not fail to meet applicable federal income tax qualification requirements or subject such Securitization to tax.

## VI.   RESERVE FUNDS

**Section 6.1   Required Repair Reserve**.[2]

**Section 6.2   Tax Funds**

**6.2.1   <u>Deposits of Tax Funds</u>**.  On the Closing Date, Borrower shall deposit with Lender the amount of $180,000.00 and there shall be deposited on each Monthly Payment Date an amount equal to one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates.  Amounts deposited pursuant to this <u>Section 6.2.1</u>. are referred to herein as the "<u>Tax Funds</u>."  If at any time Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes, Lender shall notify Borrower of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender reasonably estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Taxes; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that Taxes are due, Borrower will deposit such amount within one (1) Business Day after its receipt of such notice.

---

[2] Upfront Required Repair Reserve to be inserted if necessary based on MS's review of third-party reports.

**6.2.2   Release of Tax Funds**.  Lender shall apply the Tax Funds to payments of Taxes (except during the continuance of an Event of Default, when Lender shall have the option to apply the Tax Funds to payments of Taxes).  In making any payment relating to Taxes, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax Funds shall exceed the amounts due for Taxes, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds.  Any Tax Funds remaining after the Debt has been paid in full shall be returned to Borrower.

### Section 6.3   Insurance Funds

**6.3.1   Deposits of Insurance Funds**.  There shall be deposited on each Monthly Payment Date an amount equal to one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.  Amounts deposited pursuant to this Section 6.3.1 are referred to herein as the "Insurance Funds." If at any time Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies.  Notwithstanding the foregoing, so long as (i) no Event of Default has occurred and is continuing, and (ii) to the extent a blanket insurance policy satisfying the requirements of Section 5.1 is in full force and effect with respect to the Property, and (iii) the Insurance Premiums are current and paid in a timely manner in accordance with the terms and provisions hereof, then Borrower shall not be required to make monthly payments of the Insurance Funds pursuant to this Section 6.3.1.

**6.3.2   Release of Insurance Funds**.  Lender shall apply the Insurance Funds to payment of Insurance Premiums (except during the continuance of an Event of Default, when Lender shall have the option to apply the Insurance Funds to payment of Insurance Premiums).  In making any payment relating to Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate.  If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds.  Any Insurance Funds remaining after the Debt has been paid in full shall be returned to Borrower.

### Section 6.4   Intentionally Omitted.

### Section 6.5   Capital Expenditure Funds

**6.5.1   Deposits of Capital Expenditure Funds**.  Borrower shall deposit with Lender on each Monthly Payment Date an amount equal to $254.00 for Capital Expenditures approved by Lender, which approval shall not be unreasonably withheld, conditioned or delayed (provided that Lender's consent shall not be required for (a) any Capital Expenditures

recommended pursuant to the Property Condition Report or (b) any Capital Expenditures which do not cost in excess, in aggregate, of $50,000.00 during any calendar year).  Amounts deposited pursuant to this Section 6.4.1 are referred to herein as the "**Capital Expenditure Funds**."

      **6.5.2    Release of Capital Expenditure Funds**.  (a)  Within ten (10) days after Lender's receipt of a written request from Borrower and compliance of Borrower with the terms and provisions of Section 6.5.2(b), and provided that on the date such request is received by Lender and on the date such disbursement is to be made no Event of Default shall exist and remain uncured, Lender shall direct Cash Management Bank to disburse the requested Capital Expenditure Funds only for Capital Expenditures.

      (b)    Lender shall disburse to Borrower the Capital Expenditure Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Capital Expenditures to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Capital Expenditures, (B) stating that all Capital Expenditures at the Property to be funded by the requested disbursement have been performed or are in the process of being performed in a good and workmanlike manner and in accordance with all applicable Legal Requirements and any Lease (provided if any Capital Expenditure Funds are disbursed in connection with an invoice for work that shall not have been completed prior to the disbursement, then Borrower shall not be entitled to any additional disbursements of Capital Expenditure Funds until such time as the work described in such invoice shall have been completed), (C) identifying each Person that supplied materials or labor in connection with the Capital Expenditures to be funded by the requested disbursement, and (D) stating that each such Person has been paid in full or will be paid in full for the invoiced work upon such disbursement and to be accompanied, at Lender's option, if the cost of any individual Capital Expenditure exceeds $100,000.00, customary conditional lien waivers from the Person supplying the materials or labor, (iv) at Lender's option, if the cost of any individual Capital Expenditure exceeds $100,000.00 or all of the Capital Expenditures after the date hereof exceeds $200,000.00 in the aggregate, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (v) Lender shall have received such other evidence as Lender shall reasonably request that the Capital Expenditures at the Property to be funded by the requested disbursement have been completed (except as otherwise provided above) and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to disburse Capital Expenditure Funds more frequently than once each calendar month.

      (c)    Nothing in this Section 6.5.2 shall (i) make Lender responsible for making or completing the Capital Expenditures Work; (ii) require Lender to expend funds in addition to the Capital Expenditure Funds to complete any Capital Expenditures Work; (iii) obligate Lender to proceed with the Capital Expenditures Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any Capital Expenditures Work.

      **Section 6.6    Rollover Funds**

**6.6.1** <u>Deposits of Rollover Funds</u>.  There shall be deposited on each Monthly Payment Date an amount equal to $1,250 (the "<u>Monthly Rollover Amount</u>").  In the event that Borrower receives a fee, payment or other compensation from any Tenant relating to or in exchange for the termination of such Tenant's Lease (a "<u>Lease Termination Fee</u>"), Borrower shall immediately deposit such Lease Termination Fee with Lender, to be utilized for tenant improvements and leasing commissions that may be incurred with respect to the space relating to such Lease Termination Fee (a "<u>Termination Space</u>") and, in the event that there is a Rent Deficiency (as hereinafter defined) for the Termination Space from and after the date that the Lease for the Termination Space was terminated, in replacement of any deficiency in Rent. Amounts deposited pursuant to this <u>Section 6.6.1</u> are referred to herein as the "<u>Rollover Funds</u>."

**6.6.2** <u>Release of Rollover Funds</u>.  (a)  Lender shall disburse to Borrower the Rollover Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment or reimbursement be made and (A) specifies the tenant improvement costs and leasing commissions to be paid or reimbursed for the Termination Space pursuant to a Replacement Lease, or (B) specifies the amount by which the rent expected to be obtained by Borrower for the Termination Space during the next succeeding calendar month pursuant to one or more Replacement Leases is less than the amount of monthly rent received from the previous Tenant in the Termination Space pursuant to its Lease prior to such termination (the "<u>Rent Deficiency</u>"), (ii) on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have reviewed and, to the extent required hereby, approved the Replacement Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, if applicable, (iv) with respect to any Rollover Funds to be released by Lender for tenant improvement costs or leasing commissions pursuant to a Replacement Lease, Lender shall have received a budget for tenant improvement costs and a schedule of leasing commissions payments and the requested disbursement will be used to pay or reimburse all or a portion of such costs and payments, (v) with respect to any Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded or reimbursed by the requested disbursement have been or are in the process of being performed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations (provided if any Rollover Funds are disbursed in connection with work that shall not have been completed prior to the disbursement, then Borrower shall not be entitled to any additional disbursements of Rollover Funds until such time as the work described in such invoice shall have been completed) provided, however, if any contractor in connection with any tenant improvements shall require Borrower to deposit a retainer with such contractor, then Borrower shall have the right to a release of Rollover Funds to fund any such retainer so long as the retainer does not exceed fifteen percent (15%) of the amount of the contract and Lender, in its reasonable discretion, shall have approved the contract with such contractor and any security measures relating to such retainer, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded or reimbursed by the requested disbursement, and (C) other than in connection with a retainer, stating that each such Person has been paid in full or will be paid in full upon such disbursement for work done to date, such certificate to be accompanied by lien waivers (or conditional lien waivers, if the disbursement is made jointly to Borrower and a

third party, as provided below) or other evidence of payment reasonably satisfactory to Lender, (vi) with respect to any Rollover Funds to be released by Lender for tenant improvement costs or leasing commissions pursuant to a Replacement Lease only, Lender shall have reviewed and approved the commission or brokerage agreement in respect of which Borrower is obligated to pay or reimburse leasing commissions, and (vii) with respect to any Rollover Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the Property to be funded or reimbursed by the requested disbursement have been completed or are in the process of being completed.  Lender shall not be required to disburse Rollover Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of Rollover Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).  All Rent Deficiency disbursements made by Lender shall be deposited into the Deposit Account (if applicable at the time of such disbursement) as if such sums were received by Borrower as Rent during the calendar month after such request is made by Borrower.  To the extent that payment requested from Lender pursuant to this Section 6.6.2(a) above is for direct payment to an unaffiliated third party, provided Borrower has otherwise complied with all of the conditions set forth in this Section 6.6.2(a), Lender shall direct Servicer to disburse such funds to Borrower in the form of a check payable jointly to both Borrower and the third party to be paid.

(b)     Notwithstanding the foregoing, upon receipt by Lender of evidence that, with respect to any new Replacement Lease with a term of at least five (5) years, all tenant improvements required to be completed by Borrower pursuant to the Replacement Lease, if any, have been completed and all leasing commissions required to be paid by Borrower with respect to the Replacement Lease, if any, have been paid, and provided no Event of Default then exists, Lender shall disburse to Borrower the Rollover Funds on deposit with respect to such Termination Space provided that the rent to be obtained by Borrower for such Termination Space during the next succeeding sixty (60) calendar months pursuant to the respective Replacement Lease is equal to or greater than the sum of the monthly rent last received from the previous Tenant in such Termination Space pursuant to its Lease multiplied by sixty (60), provided, that, in the event the Replacement Lease has a free rent period, the monthly rent received during the first 60 calendar month period commencing on the date that rent is actually payable under the Replacement Lease shall be equal to or greater than the sum of the monthly rent last received from the previous Tenant in such Termination Space pursuant to its Lease multiplied by sixty (60).

### Section 6.7    Cash Trap Funds

**6.7.1   Deposits of Cash Trap Funds**.  After the occurrence and during the continuance of a Cash Management Sweep Period, all Excess Cash Flow shall be deposited with Lender to be applied (a) prior to the Maturity Date, in accordance with the terms and provisions of Section 6.7.2 below and (b) from and after the Maturity Date, in accordance with the terms and provisions of Section 2.3.3 above.  Amounts deposited pursuant to this Section 6.7.1 are referred to herein as the "Cash Trap Funds."

   **6.7.2** <u>**Release of Cash Trap Funds**</u>. (a) Prior to the Maturity Date, Lender shall disburse to Borrower the Cash Trap Funds for the payment of tenant improvement costs and leasing commissions in connection with the re-leasing of the Property in accordance with the terms and provisions of <u>Section 4.1.9</u> hereof upon material satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment or reimbursement to be made and specifies the tenant improvement costs and leasing commissions to be paid or reimbursed for pursuant to a Replacement Lease, (ii) on the date such request is received by Lender and on the date such payment or reimbursement is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have reviewed and, to the extent required hereby, approved the Replacement Lease in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions, (iv) with respect to any Cash Trap Funds to be released by Lender for tenant improvement costs or leasing commissions pursuant to a Replacement Lease, Lender shall have received a budget for tenant improvement costs and a schedule of leasing commissions payments and the requested disbursement will be used to pay or reimburse all or a portion of such costs and payments, (v) with respect to any Cash Trap Funds to be released by Lender for tenant improvement costs or leasing commissions pursuant to a Replacement Lease, Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the Property to be funded or reimbursed by the requested disbursement have been or are in the process of being performed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the tenant improvement costs (provided if any Cash Trap Funds are disbursed in connection with work that shall not have been completed prior to the disbursement, then Borrower shall not be entitled to any additional disbursements of Cash Trap Funds until such time as the work described in such invoice shall have been completed); provided, however, if any contractor in connection with any tenant improvements shall require Borrower to deposit a retainer with such contractor, then Borrower shall have the right to a release of Cash Trap Funds to fund any such retainer so long as the retainer does not exceed fifteen percent (15%) of the amount of the contract and Lender, in its reasonable discretion, shall have approved the contract with such contractor and any security measures relating to such retainer, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded or reimbursed by the requested disbursement, and (C) other than in connection with a retainer, stating that each such Person has been paid in full or will be paid in full upon such disbursement for work done to date, such certificate to be accompanied by lien waivers (or conditional lien waivers, if the disbursement is made jointly to Borrower and a third party, as provided below) or other evidence of payment reasonably satisfactory to Lender; provided, however, with respect to any Cash Trap Funds to be released by Lender for tenant improvement costs, (vi) with respect to any Cash Trap Funds to be released by Lender for tenant improvement costs or leasing commissions pursuant to a Replacement Lease, at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, (vii) Lender shall have reviewed and approved the commission or brokerage agreement in respect of which Borrower is obligated to pay or reimburse leasing commissions, and (viii) with respect to any Cash Trap Funds to be released by Lender for tenant improvements or leasing commissions pursuant to a Replacement Lease, Lender shall have received such other evidence as Lender shall reasonably request that

the tenant improvements at the Property to be funded or reimbursed by the requested disbursement have been completed or are in the process of being completed.  Lender shall not be required to disburse Cash Trap Funds more frequently than once each calendar month, unless such requested disbursement is in an amount greater than the Minimum Disbursement Amount (or a lesser amount if the total amount of Cash Trap Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).   To the extent that payment requested from Lender pursuant to this Section 6.7.2(a) above is for direct payment to an unaffiliated third party, provided Borrower has otherwise complied with all of the conditions set forth in this Section 6.7.2(a), Lender shall direct Servicer to disburse such funds to Borrower in the form of a check payable jointly to both Borrower and the third party to be paid. Notwithstanding anything in the foregoing to the contrary, and for the avoidance of doubt, so long as no Default or Event of Default shall have occurred and be continuing, Borrower shall be entitled to request the release of Cash Trap Funds in accordance with the above for any Replacement Lease under which the Replacement Tenant is not required to take possession until certain work to be performed by Borrower pursuant to the terms of such Replacement Lease is completed; provided that (1) such Replacement Lease has been approved by Lender pursuant to Section 4.1.9 hereof, (2) such Replacement Lease has no termination rights other than for casualty and condemnation on market terms, (3) any free or abated rent under the Replacement Lease is reserved for in the Rollover Reserve, and (4) Borrower complies with the terms and procedures of this Section 6.7.2.

(b)     Notwithstanding the foregoing, upon receipt by Lender of evidence that any Cash Management Sweep Period has ended on or prior to the Maturity Date, all Cash Trap Funds shall be disbursed to Borrower.

**Section 6.8     Application of Reserve Funds**.  Upon the occurrence of an Event of Default, Lender, at its option, may withdraw the Reserve Funds and apply the Reserve Funds to the items for which the Reserve Funds were established or to payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion.  Lender's right to withdraw and apply the Reserve Funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**Section 6.9     Security Interest in Reserve Funds and Interest on Reserve Funds**

**6.9.1     Grant of Security Interest**.  Borrower shall be the owner of the Reserve Funds.  Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Reserve Funds.  The Reserve Funds shall be under the sole dominion and control of Lender.

**6.9.2     Interest on Reserve Funds.**

(a) Sums on deposit in the Accounts shall not be invested except in Permitted Investments.  Interest accrued, if any, on the Reserve Funds shall become part of the applicable

Reserve Fund in accordance with the applicable terms and conditions of the Cash Management Agreement.

(b) Nothing contained in this <u>Section 6.9.2</u> shall amend, modify or waive any of the provisions of <u>Article VI</u> of this Agreement.

**6.9.3**   <u>**Income Taxes**</u>.   Borrower shall report on its federal, state and local income tax returns all interest or income accrued on the Reserve Funds.

**6.9.4**   <u>**Prohibition Against Further Encumbrance**</u>.   Borrower shall not, without the prior consent of Lender, further pledge, assign or grant any security interest in the Reserve Funds or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-l Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

**6.9.5**   <u>**Reserve Fund Indemnification**</u>.   Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds, the sums deposited therein or the performance of the obligations for which the Reserve Funds were established, except to the extent arising from the gross negligence or willful misconduct of Lender, or its agents or employees.   Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

**6.9.6**   <u>**Reserve Fund Fees and Expenses**</u>.   Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Reserve Funds, this Agreement and the enforcement hereof, including, without limitation, any reasonable monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Reserve Funds and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or  Servicer under this Agreement.

## VII.   PROPERTY MANAGEMENT

**Section 7.1   Self-Management**.   Notwithstanding anything to the contrary contained herein, so long as Borrower is Controlled by Guarantor or a Qualified Chera Family Member, Borrower shall not be required to engage Manager or any other property manager in connection with the Property.

**Section 7.2   The Management Agreement**.   (a) So long as no Event of Default has occurred and is continuing, Borrower shall have the right, without Lender's prior written consent, to enter into a Management Agreement with a Qualified Manager provided that (i) such Management Agreement is on an arms'-length basis and under which the fees payable thereunder shall not exceed four percent (4%) of Gross Revenue, subject to commercially reasonable adjustments pursuant to then applicable market standards as reasonably approved by

Lender; and (ii) such Qualified Manager and Borrower shall execute a subordination of management agreement in the form of the Assignment of Management Agreement attached hereto as Schedule II.  With respect to a new manager other than a Qualified Manager, the consent of Lender to the identity of the manager may be conditioned upon Borrower delivering a Rating Agency Confirmation as to such new manager and management agreement. Upon and during the continuance of an Event of Default, Lender shall have the right to require Borrower to replace the Manager with a new manager, which shall be a Qualified Manager, chosen by Borrower and approved by Lender

(b) If Borrower engages a Manager to manage the Property, Borrower shall cause such Manager to manage the Property in accordance with the then applicable Management Agreement entered into in accordance with the terms and conditions of Section 7.2(a) above. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of such Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of such Management Agreement on the part of Borrower to be performed and observed, and (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under such Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of such Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under such Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of such Management Agreement on the part of Borrower to be performed or observed.

(c) If at any time the Property is self-managed by Borrower and an Event of Default shall have occurred and be continuing, Borrower shall, at the request of Lender, engage a Qualified Manager in compliance with the terms and conditions of the Section 7.2.

**Section 7.3     Prohibition Against Termination or Modification**.  Borrower shall not (a) surrender, terminate, cancel, modify in any material respect, renew or extend the Management Agreement, or enter into any other agreement relating to the management or operation of the Property with Manager or any other Person, or (b) consent to the assignment by the Manager of its interest under the Management Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld.  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender.

**Section 7.4     Replacement of Manager**.  Lender shall have the right to require Borrower to engage a Manager or replace the Manager, as applicable, with a Person which is not an Affiliate of, but is chosen by, Borrower and approved by Lender upon the occurrence of any one or more of the following events: (i) at any time following the occurrence of an Event of Default, (ii) if Manager shall be insolvent or a debtor in a bankruptcy proceeding, (iii) if Manager shall be in default under the Management Agreement beyond any applicable notice and

cure period or if at any time the Manager has engaged in gross negligence, fraud, misappropriation of funds, or willful misconduct, or (iv) if Manager is an Affiliated Manager, Manager is not managing the Property in accordance with the management practices of nationally recognized management companies managing similar properties in locations comparable to the related property.

## VIII.   PERMITTED TRANSFERS

**Section 8.1      Transfer of the Property**.  Prior to and including the Permitted Transfer Date, Borrower shall not be permitted to Transfer the Property (a "<u>Property Sale</u>") without Lender's consent, which consent shall be in Lender's sole and absolute discretion. After the Permitted Transfer Date, Borrower shall not be permitted to Transfer the Property without Lender's consent, which consent shall not be unreasonably withheld, conditioned or delayed for one (1) Property Sale after the Permitted Transfer Date (the "<u>Post-Transfer Date Initial Sale</u>"); provided, however, that after Post-Transfer Date Initial Sale, Borrower shall not be permitted to Transfer the Property without Lender's consent, which consent shall be in Lender's sole and absolute discretion. In the event Lender consents to a Property Sale, Lender shall require that the following conditions be satisfied together with such other conditions determined by Lender at the time of the request for consent to a Property Sale: (a) Lender shall have received an agreement, acceptable to it in its sole but reasonable discretion, pursuant to which the transferee (which shall satisfy all of the requirements of <u>Section 3.1.24</u>) assumes all of Borrower's obligations under the Loan Documents and a guarantee from a replacement guarantor acceptable to Lender in its sole but reasonable discretion with respect to any guaranty delivered in connection with the Loan substantially in the form of any such guaranty, (b) Lender receives a loan assumption application fee equal to one-half of one percent (0.5%) of the outstanding principal amount of the Loan for the first Property Sale, and a loan assumption application fee equal to one percent (1%) of the outstanding principal amount of the Loan for each Property Sale thereafter, (c)  Lender shall have received such documents, certificates and legal opinions as it may reasonably request in connection with the Property Sale, and (d) Borrower shall pay for all of Lender's reasonable out-of-pocket costs and expenses in connection with any request for consent and/or consummation of a Property Sale.   Lender agrees that Lender shall not unreasonably withhold consent to a Property Sale to a Permitted Transferee, provided, that, the other requirements set forth in clauses (a)-(d) of this Section shall apply to any such Property Sale. Notwithstanding anything to the contrary contained in this Agreement, Borrower may consummate a Property Sale and prepay the Debt in whole pursuant to the terms of this Agreement without Lender's consent to such Property Sale.

**Section 8.2      Permitted Transfers of Equity Interests**

(a)      Notwithstanding the restrictions contained in <u>Section 4.2.1</u> hereof or in <u>Article 6</u> of the Mortgage or otherwise in the Loan Documents to the contrary, the following transfers shall be permitted without Lender's consent: (i) a transfer (but not a pledge) by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party, (ii) the transfer (but not the pledge), in one or a series of transactions, of the stock, partnership interests or membership interests (as the case may be) in a Restricted Party, and (iii) the sale, transfer or issuance of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock

Exchange or another nationally recognized stock exchange; provided, however, with respect to the transfers listed in clauses (i) and (ii) above, (A) Lender shall receive not less than thirty (30) days prior written notice of such transfers (other than in connection with a transfer of the type described in clause (i) above, provided that in such instance notice thereof shall be provided to Lender promptly after the occurrence of such transfer), (B) no such transfers shall result in a change in Control of Borrower, Guarantor, or Affiliated Manager, (C) after giving effect to such transfers, (I) Guarantor and/or Qualified Chera Family Members shall in the aggregate own at least a 51% direct or indirect equity ownership interest in Borrower; (II) Guarantor and/or Qualified Chera Family Members shall Control Borrower; and (III) Guarantor and/or Qualified Chera Family Members shall control the day-to-day operation of the Property, (D) the Property shall continue to be managed by Borrower or a new manager approved in accordance with Sections 7.2 and 7.4 hereof, (E) in the case of the transfer of any direct equity ownership interests in Borrower or in any SPC Party, such transfers shall be conditioned upon continued compliance with the relevant provisions of Section 3.1.24 hereof, and (F) such transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question, (I) remake the representations contained herein relating to ERISA matters and Prescribed Laws (and, upon Lender's request, Borrower shall deliver to Lender (x) an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer, and (y) searches, reasonably acceptable to Lender, for (1) any entity or individual owning, directly or indirectly, 20% or more of the interests in the Borrower as a result of such transfer, and (2) a Qualified Chera Family Member, if such Person is reasonably approved by Lender to Control Borrower after the death or incapacity of Haim Chera, Isaac Chera, and Richard Chera), and (II) continue to comply with the covenants contained herein relating to ERISA matters and Prescribed Laws, and (G) in the event of the death or incapacity of Gurantor, one or more replacement guarantors shall be provided, each to be approved by Lender in its sole discretion.  The conditions to transfers set forth in clauses (A)-(G) of this Section 8.2(a) are the "Transfer Conditions".

(b)     In addition to the transfers permitted pursuant to clause (a) above, upon prior written approval of Lender not to be unreasonably withheld, conditioned or delayed, (i) a transfer, in one or a series of transactions, whereby the transferee thereunder owns, at any time, in the aggregate, of more than 49% of the direct or indirect interests in a Restricted Party to a Permitted Transferee, (ii) a transfer of up to 75% of the non-managing interest in Borrower to any Person approved by Lender, and (iii) a transfer amongst the Members or Qualified Chera Family Members shall be permitted if (A) Borrower delivers all information related to the proposed transferee reasonably required by the Lender to determine whether it will grant or withhold approval thereof, such approval not to be unreasonably withheld and (B) Transfer Conditions (B)-(G) in Section 8.2(a) are satisfied.  Lender hereby agrees that in the event of a transfer pursuant to this subsection (b), Borrower shall be permitted to propose to Lender an additional guarantor to be approved by Lender in its sole discretion, provided, that, (i) such additional gurantor must be a natural person, and (ii) if the proposed additional guarantor has a Net Worth and Liquidity not less than the Guarantor's Net Worth and Liquidity on the date of request and the date of the related transfer, Lender's approval shall not be unreasonably withheld, conditioned or delayed.  In the event Lender approves such additional guarantor (the "Additional Guarantor"), Lender agrees that provided the Additional Guarantor executes and delivers to Lender a new guaranty in the same form as the Guaranty, that the liability between

Additional Guarantor and Guarantor shall be joint and several, and provided further that any documentation evidencing the same is acceptable to Lender in its sole discretion.

## IX.     SALE AND SECURITIZATION OF MORTGAGE

### Section 9.1     Sale of Mortgage and Securitization

(a)      Subject to the limitations in <u>Section 11.27</u>, Lender shall have the right, at Lender's sole cost and expense, (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.  (The transaction referred to in clauses (i), (ii) and (iii) shall hereinafter be referred to collectively as "<u>Secondary Market Transactions</u>" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "<u>Securitization.</u>" Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "<u>Securities.</u>")

(b)      If requested by Lender, Borrower shall assist Lender in reasonably satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transactions, including, without limitation, to:

(i)      (A) provide updated financial and other reasonably requested information with respect to the Property, the business operated at the Property, Borrower, Guarantor, and the Manager, (B) provide updated budgets relating to the Property and (C) at Lender's sole cost and expense, provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "<u>Updated Information</u>"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)      at Lender's sole cost and expense, provide customary opinions of counsel, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to fraudulent conveyance, matters of Delaware and federal bankruptcy law relating to single-member limited liability companies, and true Property Sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property and Borrower and Affiliates, which counsel and opinions shall be reasonably satisfactory in form and substance to Lender and the Rating Agencies;

(iii)      provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents; and

(iv)      at Lender's sole cost and expense (provided Lender will only reimburse Borrower's costs and expenses to the extent they are reasonable), execute such reasonable amendments to the Loan Documents and Borrower or any SPC Party's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies or otherwise to effect the Securitization including, without limitation,

bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure (any of the foregoing, a "Loan Bifurcation"); provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal as set forth herein or in the Note, (B) modify or amend any other material economic term of the Loan in the Note, except in connection with a Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note or (C) either (y) increase, except to a de minimis extent, its obligations or (z) decrease, except to a de minimis extent, its rights, under the Loan Documents. In the event Borrower fails to execute and deliver such documents to Lender within five (5) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof. It shall be an Event of Default under this Agreement, the Note, the Mortgage and the other Loan Documents if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.1(b)(iv) after expiration of ten (10) Business Days after notice thereof.

(c)     If, at the time one or more Disclosure Documents are being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Properties alone or the Properties and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request (i) the selected financial data or, if applicable, Net Operating Income, required under Item 1112(b)(1) of Regulation AB, if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization or (ii) the financial statements required under Item 1112(b)(2) of Regulation AB, if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization. Such financial data or financial statements shall be furnished to Lender (A) within fifteen (15) Business Days after notice from Lender in connection with the preparation of Disclosure Documents for the Securitization, (B) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (C) not later than seventy-five (75) days after the end of each fiscal year of Borrower; provided, however, that Borrower shall not be obligated to furnish financial data or financial statements pursuant to clauses (B) or (C) of this sentence with respect to any period for which a filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "Exchange Act Filing") is not required. If requested by Lender, Borrower shall use commercially reasonable efforts to furnish to Lender financial data and/or financial statements for any tenant of any of the Property that is required to

deliver such information to Borrower pursuant to its Lease if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of affiliated tenants, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of affiliated tenants would constitute a Significant Obligor.

(d)     All financial data and financial statements provided and prepared by Borrower (i.e., as opposed to information which may have been provided by a tenant unless such tenant is required to deliver financial information prepared in accordance with GAAP pursuant to its Lease) hereunder pursuant to <u>Section 9.1(c)</u> and <u>(d)</u> hereof shall be prepared in accordance with tax basis accounting standards, and shall meet the requirements of Regulation AB and other applicable legal requirements. All financial statements referred to in <u>Section 9.1(c)</u> above which is prepared and provided by Borrower (i.e., as opposed to information which may have been provided by a tenant unless such tenant is required to deliver audited financial information pursuant to its Lease) shall be audited by independent accountants of Borrower acceptable to the requesting Lender in accordance with Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All financial data and financial statements (audited or unaudited) provided by Borrower under <u>Section 9.1(c)</u> shall be accompanied by an Officer's Certificate which shall state that such financial statements meet the requirements set forth in the first sentence of this <u>Section 9.1(d)</u>.

(e)     If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by Lender.

(f)     In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or other legal requirements are other than as provided herein, then notwithstanding the provisions of <u>Section 9.l(c)</u> and <u>(d)</u>, Lender may request, and Borrower shall promptly provide, such other financial statements as Lender reasonably determines to be necessary or appropriate for such compliance.

(g)     Lender agrees to reimburse Borrower for any costs and expenses incurred in connection with its compliance with this <u>Section 9.1</u> that are in excess of $25,000.00, provided, that, Lender will also reimburse Borrower for its costs and expenses as specifically set forth in <u>Section 9.l(a)(iv)</u>.

### Section 9.2        Securitization Indemnification

(a)        Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in disclosure documents in connection with the Securitization, including, without limitation, an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, an "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and may be made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.

(b)        Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager, Guarantor, and all other aspects of the Loan (the "Relevant Sections"), to Borrower's knowledge upon due inquiry, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include each of their respective officers and directors), the Affiliate of Morgan Stanley that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Morgan Stanley Group"), and Morgan Stanley, and any other placement agent or underwriter with respect to the Securitization, each of their respective directors and each Person who controls Morgan Stanley or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the Morgan Stanley Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any knowingly untrue statement or alleged knowingly untrue statement of any material fact contained in the Relevant Sections or arise out of or are based upon the intentional omission or alleged intentional omission to state therein a material fact required to be stated in the Relevant Sections or necessary in order to make the statements in the Relevant Sections, in light of the circumstances under which they were made, not intentionally misleading and (C) agreeing to reimburse Lender, the Morgan Stanley Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Morgan Stanley Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such knowingly untrue statement or intentional omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent

rolls with respect to the Property.  This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

(c)     In connection with Exchange Act Filings, Borrower shall (i) indemnify Lender, the Morgan Stanley Group and the Underwriter Group for Liabilities to which Lender, the Morgan Stanley Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any knowingly untrue statement or alleged knowingly untrue statement of any material fact in the Relevant Sections of the Disclosure Document or upon the intentional omission or alleged intentional omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document related to Relevant Sections, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Morgan Stanley Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Morgan Stanley Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any reasonable legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) for any reason held to be unenforceable as to an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by

the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Morgan Stanley's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)     The liabilities and obligations of each of Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 9.3     **Rating Surveillance**.  Lender shall have the right to retain the Rating Agencies to provide rating surveillance services on any certificates issued in a Securitization.  Such rating surveillance will be at the expense of Lender.

X.     **DEFAULTS**

**Section 10.1   Event of Default**

(a)     Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)     if (A) any monthly installment of principal and/or interest due under the Note, any amount required to be deposited into the Reserve Funds, (B) the payment due on the Maturity Date is not paid when due, or (C) any other portion of the Debt is not paid when due, and such non-payment referred to under this Section 10.1(a)(i)(A) or 10.1(a)(i)(C) continues for five (5) days following notice to Borrower that the same is due and payable;

(ii)     if any of the Taxes or Other Charges are not paid prior to the date that interest and penalties shall accrue as a result of such untimely payment; provided that it shall not be an Event of Default if Taxes or Other Charges are not paid when due if sufficient Tax Funds are on deposit with Lender to pay currently due Taxes and Other Charges when due and Borrower has not attempted to delay, prevent, enjoin or otherwise disrupt or interfere with the payment of such sums and no other Event of Default has occurred;

(iii)     if the Policies are not kept in full force and effect;

(iv)     if Borrower breaches or permits or suffers a breach of Section 4.2.1 hereof or Article 6 of the Mortgage;

(v)     if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other

instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)     if Borrower, any SPC Party or Guarantor shall make an assignment for the benefit of creditors;

(vii)     if a receiver, liquidator or trustee shall be appointed for Borrower, any SPC Party or Guarantor or if Borrower, any SPC Party or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, any SPC Party or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, any SPC Party or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, any SPC Party or Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(viii)     if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days from the earlier to occur of notice from Lender or Borrower's knowledge of such Lien;

(ix)     if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)     Intentionally omitted;

(xi)     (A) if Borrower violates or does not comply with any of the provisions of Section 4.1.6 hereof and compliance does not occur within ten (10) days from the earlier to occur of notice from Lender or Borrower's knowledge of such non-compliance provided that Borrower shall only have the ten (10) day cure period one time per calendar year, or (B) Borrower or any SPC Party breaches any representation, warranty or covenant contained in Section 3.1.24 hereof; provided, however, that a breach of any such representation, warranty or covenant contained in Section 3.1.24 shall not constitute an Event of Default if (1) such breach is immaterial, inadvertent and non-recurring, and (2) the Borrower shall promptly cure such breach within fifteen (15) days from the earlier to occur of notice from Lender or Borrower's knowledge of such breach;

(xii)     if Borrower or Guarantor fails to comply with the covenants as to Prescribed Laws set forth in Section 4.1.1;

(xiii)     if Borrower breaches any of the negative covenants contained in Sections 4.2.11 or 4.2.12;

(xiv)     Intentionally omitted;

(xv)   if Guarantor breaches in any material respect any covenant, warranty or representation contained in the Guaranty;

(xvi)   Intentionally omitted;

(xvii)   if Borrower fails to deposit any funds required to be deposited into any reserve pursuant to Article VI hereof within 15 Business Days after such funds become due;

(xviii)  if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in Subsections (i) to (xvii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30 day period and provided further that Borrower shall have commenced to cure such Default within such 30 day period and thereafter diligently and expeditiously proceeds to cure the same, such 30 day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed 120 days plus time permitted for Excusable Delays; or

(xix)   if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

(b)   Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above with respect to the Borrower and/or SPC Party only) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above with respect to the Borrower and/or SPC Party only, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## Section 10.2   Remedies of Lender

(a)   Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to,

Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender, as applicable, may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) if the Event of Default is pursuant to Section 10.l(a)(i)(A), Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(c)     Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender except that in no event shall Borrower be required to sign any documents which would either (y) increase, except to a de minimis extent, its obligations or (z) decrease, except to a de minimis extent, its rights, under the Loan Documents.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until five (5) Business Days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Except as may be required in connection with a Securitization pursuant to Section 9.1 hereof, (i) Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and (ii) the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such

representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date. All reasonable expenses incurred by Borrower in complying with this <u>Section 10.2(c)</u> shall be reimbursed by Lender provided no Event of Default exists at the time Lender requires the Severed Loan Documents.

(d)     Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

**Section 10.3   Right to Cure Defaults**. Upon the occurrence and during the continuance of an Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, (i) make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary, and (ii) enter upon the Property for purposes related to the Event of Default, or appear in, defend, or bring any action or proceeding to protect its interest in the Property. Any costs and expenses incurred by Lender in connection with actions taken pursuant to this <u>Section 10.3</u> (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this <u>Section 10.3</u>, shall constitute a portion of the Debt and shall be due and payable to Lender. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

**Section 10.4   Remedies Cumulative**. The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender, as applicable may determine in their respective sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## XI.    MISCELLANEOUS

**Section 11.1   Successors And Assigns**. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 11.2   Lender's Discretion**.   Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive. Prior to a Securitization, whenever pursuant to this Agreement the Rating Agencies are given any right to approve or disapprove, or any arrangement or term is to be satisfactory to the Rating Agencies, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory, based upon Lender's determination of Rating Agency criteria, shall be substituted therefore.

**Section 11.3   Governing Law**

(a)   **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND**

CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> MORRIS MISSRY, ESQ.
> WACHTEL MASYR & MISSRY LLP
> ONE DAG HAMMARSKJOLD PLAZA
> 885 SECOND AVENUE, 47TH FLOOR
> NEW YORK, NEW YORK 10017

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**Section 11.4   Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or

demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 11.5   Delay Not a Waiver**.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**Section 11.6   Notices**.  All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by telefax (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 11.6.   Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed by regular or certified mail, (b) on the date of sending by telefax if sent during business hours on a Business Day (otherwise on the next Business Day) upon confirmation of such transmission, (c) on the date of delivery by hand if actually received during business hours on a Business Day (otherwise on the next Business Day), and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

|  |  |
|---|---|
| If to Lender: | Morgan Stanley Mortgage Capital Holdings LLC<br>1585 Broadway, Floor 10<br>New York, New York 10036<br>Attention: James Flaum<br>Facsimile No. (212) 507-4139 |
| with a copy to: | Paul Hastings LLP<br>75 East 55th Street, Floor 9<br>New York, New York 10022<br>Attention:  Eric F. Allendorf, Esq.<br>Facsimile No. (212) 230-5173 |
| If to Borrower: | 262 East Fordham Realty, LLC<br>c/o Crown Acquisitions, Inc.<br>767 Fifth Avenue, 24th Floor<br>New York, New York 10153<br>Attention: Isaac Chera |

Facsimile No.: (646) 412-1869

with a copy to:                    Wachtel Masyr & Missry LLP
                                   One Dag Hammarskjold Plaza
                                   885 Second Avenue, 47th Floor
                                   New York, New York 10017
                                   Attention: Morris Missry, Esq.
                                   Facsimile No.: (212) 909-9448

**Section 11.7   TRIAL BY JURY.   BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

**Section 11.8   Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 11.9   Severability**.    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 11.10  Preferences**.  Each Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 11.11  Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender

to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 11.12 Remedies of Borrower**.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 11.13 Expenses;  General Indemnity;  Mortgage Tax Indemnity; ERISA Indemnity**

(a)      Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender, for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) Borrower's ongoing performance of and compliance with Borrower's agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (ii) intentionally omitted; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (vi) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any "special servicing" of the Loan or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceedings (including, without limitation, loan servicing or special servicing fees, loan advances, and "work-out" and/or  liquidation fees); and (vii) the underwriting and due diligence for making the Loan and the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  Any costs due and payable to Lender may be paid to Lender pursuant to the Cash Management Agreement.

(b)     Borrower shall indemnify, defend and hold harmless Lender, each participant in the Loan and their respective officers, directors, agents, employees (and the successors and assigns of the foregoing) (each, an "Indemnified Party", and collectively, the "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for the Indemnified Parties in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not the Indemnified Parties shall be designated a party thereto), that may be imposed on, incurred by, or asserted against the Indemnified Parties in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "Indemnified Liabilities"); provided, however, that Borrower shall not have any obligation to the Indemnified Parties hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.

(c)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Party from and against any and all losses, damages, costs, expenses, liabilities, claims or other obligations ("Losses") imposed upon or incurred by or asserted against any Indemnified Party and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Mortgage, the Note or any of the other Loan Documents, and (ii) any transfer tax incurred by any Indemnified Party in connection with the exercise of remedies hereunder, under the Mortgage or under any other Loan Documents.

(d)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Party from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the Property Sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.1.8 and/or 4.2.11 of this Agreement.

**Section 11.14 Schedules Incorporated**.  The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 11.15 Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding

brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

### Section 11.16  No Joint Venture or Partnership; No Third Party Beneficiaries

(a)     Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Borrower and Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Borrower and Lender any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

### Section 11.17  Publicity.  All news releases, publicity or advertising by Borrower

or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Morgan Stanley Mortgage Capital Holdings LLC, or any of their Affiliates shall be subject to the prior approval of Lender.

### Section 11.18  Waiver of Marshalling of Assets.  To the fullest extent permitted

by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the Property Sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a Property Sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

### Section 11.19  Waiver  of  Offsets/Defenses/Counterclaims.   Borrower hereby

waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

**Section 11.20 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 11.21 Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Estreich & Company Inc. ("Broker") and Borrower shall pay such Broker its fees at closing pursuant to a separate agreement.  Borrower shall indemnify, defend and hold each Indemnified Party harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

**Section 11.22 Exculpation**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment or any deficiency judgment or other judgment establishing personal liability shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or affiliate of Borrower (but specifically excluding Guarantor) or any legal representatives, successors or assigns of any of the foregoing (collectively, the "Exculpated Parties"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties, in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents.  The

provisions of this Section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and Property Sale under the Mortgage; (c) affect the validity or enforceability of any indemnity, guaranty, or similar instrument made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) impair the right of Lender to enforce the provisions of the Environmental Indemnity or of Section 4.1.6(h) of this Agreement; (g) constitute a prohibition against Lender to seek a deficiency judgment against Borrower solely in order to fully realize on any security given by Borrower in connection with the Loan or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against such security; or (h) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Losses incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i)      fraud or intentional misrepresentation by Borrower, any of the Exculpated Parties, or any Borrower Parties in connection with the Loan;

(ii)      the gross negligence or willful misconduct of Borrower any of the Exculpated Parties or any Borrower Parties in connection with the Loan;

(iii)      the material breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

(iv)      waste to the Property caused by intentional acts or intentional omissions of Borrower, any Exculpated Party, or any Borrower Party, or the removal or disposal of any portion of the Property after an Event of Default;

(v)      the misappropriation or conversion by Borrower, any of the Exculpated Parties or any Borrower Parties of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, or (C) any Rents following an Event of Default or (D) any Tenant security deposits or Rents collected in advance;

(vi)      any Personal Property (as defined in the Mortgage) taken from the Property by or on behalf of Borrower, any of the Exculpated Parties or any Borrower Parties and not replaced with Personal Property of the same utility and of the same of greater value;

(vii)      any act of arson by Borrower, any of the Exculpated Parties or any Borrower Parties;

(viii)   any fees or commissions paid by Borrower after the occurrence of an Event of Default to any Exculpated Party or any Borrower Party in violation of the terms of the Note, this Agreement, the Mortgage or the other Loan Documents;

(ix)   failure to pay Taxes, charges for labor or materials, or other charges that can create Liens on any portion of the Property and/or the failure to pay Insurance Premiums in accordance with the terms hereof at any time there is sufficient Gross Revenue to pay the same, unless there are sufficient amounts on reserve as Tax Funds or Insurance Funds hereunder, as applicable, and Lender shall not have made such amounts available to pay the same;

(x)   any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(xi)   any failure by Borrower to permit on-site inspections of the Property at any time during the continuance of an Event of Default;

(xii)   after the occurrence of an Event of Default, any failure by Borrower to comply with all written notices and instructions of Lender delivered pursuant to the terms of the Assignment of Management Agreement or Section 7.4 of this Agreement;

(xiii)   Borrower's breach of, or failure to comply with, the representations, warranties and covenants contained in Sections 4.1.5 of this Agreement;

(xiv)   Borrower's indemnification of Lender set forth in Sections 9.2, 11.13(c), and (d) hereof;

(xv)   Borrower's breach of, or failure to comply with, the representations, warranties and covenants contained in Section 4.1.9(c) of this Agreement as such representations, warranties and covenants relate to correspondence, notices and information with respect to default by the Borrower or tenant under a Lease or any threat or actual termination of a Lease;

(xvi)   the seizure or forfeiture of the Property, or any portion thereof, or Borrower's interest therein, resulting from criminal wrongdoing by Borrower, any of the Exculpated Parties or any Borrower Parties; and

(xvii)   Borrower fails to comply with the provisions of Section 4.2.13 hereof.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code

to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) Borrower fails to comply with the provisions of Section 4.2.1 hereof or Article VIII hereof; (ii) Borrower fails to comply with any provision of Section 3.1.24 of this Agreement, provided, that, the Debt shall not be fully recourse to Borrower for the failure to comply with Section 3.1.24 if (A) such failure to comply is immaterial, inadvertent and non-recurring, (B) the Borrower shall promptly cure such failure to comply within fifteen (15) days, and (C) such breach does not result in the substantive consolidation of the Borrower's assets with any direct or indirect parent thereof, (iii) intentionally omitted; (iv) Borrower or any SPC Party files a voluntary petition under the Bankruptcy code or any other Federal or state bankruptcy or insolvency law; (v) an Affiliate, officer, director, or representative which Controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person; (vi) Borrower or any SPC Party files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (vii) any Affiliate, officer, director, or representative which Controls Borrower consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any SPC Party or any portion of the Property; (viii) Borrower or any SPC Party makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (ix) there is substantive consolidation of Borrower (or any Restricted Party) with any other Person in connection with any federal or state bankruptcy proceeding involving the Guarantor or any of its Affiliates; (x) Borrower (or any Restricted Party) contests or opposes any motion made by Lender to obtain relief from the automatic stay or seeks to reinstate the automatic stay in the event of any federal or state bankruptcy or insolvency proceeding involving the Guarantor or its Affiliates; (xi) Borrower (or any Restricted Party) accepts from any Guarantor or Guarantor solicits or provides any debtor-in-possession financing to Borrower in the event Borrower (or any Restricted Party) is the subject of a bankruptcy or insolvency proceeding; and (xii) any actions or proceedings of any kind or nature whatsoever are instituted by or on behalf of Borrower or Guarantor (or any of their affiliates) (an "Opposition Action") that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the ability of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents with respect to the foreclosure of the lien of the Mortgage, as applicable, together with any attorneys fees and other litigation costs incurred by Lender and/or any Participant in the foreclosure and in the Opposition Action; provided, however, Borrower shall have no liability to Lender pursuant to this clause (xii) in the event a court of competent jurisdiction, in a final non-appealable decision, finds in favor of the defenses or opposition raised by Borrower or Guarantor in such Opposition Action and issues a permanent injunction against Lender's foreclosure which does not allow Lender to foreclose on the lien created by the Mortgage.

**Section 11.23 Prior Agreements**.   This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such

parties, whether oral or written, including, without limitation, the letter dated November 15, 2012 (as amended) between Borrower and Lender, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 11.24  Servicer**

(a)     At the option of Lender, the Loan may be serviced by a servicer (the "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender and Servicer.  Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement; provided, however, that Borrower shall not be responsible for payment of the monthly servicing fee due to the Servicer under the Servicing Agreement.  In addition to any fees payable pursuant to the immediately preceding sentence, Borrower shall be responsible for paying any and all costs and expenses incurred by the Lender (including all trust fund expenses) that are incurred in connection with any transfer of the Loan to special servicing (which shall include, without limitation, all special servicing fees and workout fees that the special servicer is entitled to receive under the Servicing Agreement with respect to the Loan).  Servicer shall, however, be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto under the applicable provisions of this Agreement and the other Loan Documents.

(b)     Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower pursuant to the provisions of this Agreement, the Note and the other Loan Documents.

(c)     Provided Borrower shall have been given notice of Servicer's address by Lender, Borrower shall deliver to Servicer duplicate originals of all notices and other instruments which Borrower may or shall be required to deliver to Lender pursuant to this Agreement, the Note and the other Loan Documents (and no deliver of such notices or other instruments by Borrower shall be of any force or effect unless delivered to Lender and Servicer as provided above).

**Section 11.25  Joint and Several Liability**.  If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

**Section 11.26  Creation of Security Interest**.  Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgage or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgage and any other Loan Document (including, without limitation, the advances owing to it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

**Section 11.27  Assignments and Participations**.

(a)     Borrower may not assign this Agreement or any of its rights or obligations hereunder without the prior approval of Lender.

(b)     No lender shall assign, transfer, sell, pledge or hypothecate all or any portion of its rights or obligations in and to the Loan to any other Person (a Person to which any such assignment, transfer or sale is made in accordance with this <u>Article XI</u> being an "<u>Assignee</u>"):

(i)     without the prior written consent of Lender, which consent shall not be unreasonably withheld and shall not be required if the Assignee is an Affiliate of such lender and <u>provided</u> that such lender shall not be released from its continuing obligations hereunder after such assignment to its Affiliate;

(ii)     unless such transaction shall be an assignment of a constant and not a varying, ratable percentage of such lender's interest in the Loan;

(iii)     unless the aggregate principal amount of the Loan which is the subject of such transaction is Five Million Dollars ($5,000,000) or more;

(iv)     unless, after giving effect to such transaction, such lender's aggregate unassigned interest in the Loan shall be in a principal amount of at least Five Million Dollars ($5,000,000) unless such transaction encompasses all of such lender's rights in and to the Loan in which case such lender shall have assigned all of its rights in and to the Loan; and

(v)     the parties to each such assignment shall execute and deliver to Lender Lender's form of assignment and acceptance agreement, with appropriate completions (each, an "<u>Assignment and Acceptance</u>"), together with a processing and registration fee of $2,500, which fee shall cover Lender's cost in connection with the assignments under this Agreement.

(c)     Borrower agrees to execute, or cause Guarantor to execute, within seven (7) Business Days after request therefor is made by Lender, any documents and/or estoppel certificates reasonably requested by Lender in connection with such assignment or participation, without charge or expense to Borrower; <u>provided</u> that (i) such documents and/or estoppel certificates do not expand the liability or obligations of Borrower or Guarantor or reduce Assignee's or Participant's obligations and (ii) in no event shall Borrower be required to sign any documents which would either (y) increase, except to a de minimis extent, its obligations or (z) decrease, except to a de minimis extent, its rights, under the Loan Documents.

(d)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a lender hereunder and (y) subject to <u>Sections 11.27(c)(i)</u> and <u>(ii)</u> above, the lender assignor thereunder shall, to the extent of the interest assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning lender's rights and obligations under this Agreement, such lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 2.2.3</u>, <u>2.5</u>, <u>11.12</u>, and <u>11.13</u> hereof.

(e)       Intentionally omitted.

(f)       Upon its receipt of an Assignment and Acceptance executed by an assigning lender and an Assignee (and, in the case of an Assignee that is not then a lender or an affiliate thereof, by Borrower and Lender) together with payment to Lender of a registration and processing fee of $2,500, Lender shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto give notice of such acceptance and recordation to the lenders and the Borrower.

(g)       Borrower authorizes each lender to disclose to any Assignee or Participant of such lender (each, a "Transferee"), any prospective Transferee, any Affiliate of such lender, any derivative counterparty or any Rating Agency any and all financial or other information in such lender's possession concerning Borrower and its Affiliates which has been delivered to such lender by or on behalf of Borrower pursuant to this Agreement or which has been delivered to such lender by or on behalf of Borrower in connection with such lender's credit evaluation of Borrower and its Affiliates prior to becoming a party to this Agreement.

(h)       Any lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank in accordance with applicable law, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release such lender from any of its obligations hereunder or substitute any such pledgee or assignee for such lender as a party hereto.

(i)       Borrower agrees that at Lender's sole cost and expense (provided such costs and expenses are reasonable) (i) Borrower shall execute and deliver to Lender any amendment and/or other document that may be reasonably necessary to effectuate such an assignment but in no event shall Borrower be required to sign any documents which would either (y) increase, except to a de minimis extent, its obligations or (z) decrease, except to a de minimis extent, its rights, under the Loan Documents and (ii) after the effective date under such Assignment and Acceptance, upon the request to Lender by any lender, Borrower shall execute and deliver to such lender one or more substitute notes of Borrower evidencing such lender's ratable share of the Loan, with appropriate insertions as to payee and principal amount; each such substitute note shall be dated as of the date hereof.

(j)       Any lender may, without the consent of Lender or Borrower sell participations to one or more Persons (each a "Participant") in or to all or a portion of such lender's rights and obligations under this Agreement; provided, however, that (i) such lender's obligations under this Agreement shall remain unchanged, (ii) except as otherwise provided in Section 2.5, such lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such lender shall remain the holder of any Note for all purposes of this Agreement and (iv) Borrower, Lender and the other lenders shall continue to deal solely and directly with such lender in connection with such lender's rights and obligations under and in respect of this Agreement and the other Loan Documents.

(k)     Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.27, disclose to the assignee or participant or proposed assignee or participant, as the case may be, any information relating to Borrower or any of its Affiliates or to any aspect of the Loan that has been furnished to the Lender by or on behalf of the Borrower or any of its Affiliates.

(l)     Subject to acceptance and recording thereof pursuant to paragraph (g) of this Section 11.27, upon such assignment the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such assignment, have the rights and obligations of Lender under this Agreement.  Any assignment or transfer by Lender of rights or obligations under this Agreement that does not comply with this Section 11.27 shall be treated for purposes of this Agreement as a sale by such lender of a participation in such rights and obligations in accordance with clause (k) of this Section 11.27.

(m)     Notwithstanding anything to the contrary contained herein but subject to the terms and provisions of Section 2.5(f) hereof, each lender shall have the right at any time without the consent of or notice to any other Person to grant a security interest in, pledge, assign or otherwise transfer all or any portion of such lender's interest in one or more of the Notes or all or a portion of the Loan to (i) any Federal Reserve Bank or the central reserve bank or similar authority of any other country to secure any obligation of Lender to such bank or similar authority (a "Central Bank Pledge") or (ii) the trustee, administrator or receiver (or their respective nominees, collateral agents or collateral trustees) of a mortgage pool securing covered mortgage bonds issued by a German mortgage bank, or any other Person permitted to issue covered mortgage bonds, under German Pfandbrief legislation, as such legislation may be amended and in effect from time to time, on any substitute or successor legislation (a "Pfandbrief Pledge").  The assigning lender shall have no further liability hereunder with respect to the interest that was the subject of such transfer and the assignee shall be a lender with respect to such interest.  Lender shall not be required to notify Borrower of any Central Bank Pledge or Pfandbrief Pledge.  Borrower and each Restricted Party agree to execute within fifteen (15) Business Days after request therefor is made by Lender, any documents or any amendments, amendments and restatements, and/or modifications to any Loan Documents and/or additional documents (including, without limitation, amended, amended and restated, modified and/or additional promissory notes) and/or estoppel certificates reasonably requested by Lender in order to make the Loan Documents eligible under German pfandbrief legislation; provided, however, that Borrower shall not be required to enter into any such documents and amendments which would increase Borrower's affirmative obligations or decrease Borrower's rights under the Loan Documents or adversely affect the economic or other material terms of the Loan and the applicable Lender shall reimburse Borrower's reasonable out-of-pocket expenses incurred in connection with the foregoing (other than in connection with delivering an estoppel certificate).

### Section 11.28 Set-Off.

In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special,

time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

MORGAN STANLEY MORTGAGE
CAPITAL HOLDINGS LLC, a New York
limited liability company

By: _____

Name:

Title:

Kristin Sansone
Vice President

[Signatures continue on following page]

Signature Page to Loan Agreement

**BORROWER:**

262 EAST FORDHAM REALTY LLC,
a New York limited liability company

By: _____
    Name: Isaac Chera
    Title:  Authorized Signatory

## **SCHEDULE I**

**RENT ROLL**

(attached hereto)

**270 East Fordham Road**

**Rent Roll - As of January 29, 2013**

| Tenant: | Lease Commencement Date | Monthly Base Rent: | Annual Base Rent: | Lease Expiration | Size |
|---|---|---|---|---|---|
| **Finish Line** | 2/10/2005 | $49,000 | $588,000 | 2/10/2015 | |
| Ground | | | | | 3,100 sq ft |
| Basement | | | | | 4,100 sq ft |
| **Modells** | 10/1/2012 | $79,166 | $950,000 | 12/1/2022 | |
| Ground | | | | | 4,100 sq ft |
| Second | | | | | 6,800 sq ft |
| Basement | | | | | 2,200 sq ft |

NOTE - Modell's is paying a reduced rent thru June 2013

I certify the above information to be true and accurate to the best of my ability.

**Isaac Chera**

## **SCHEDULE II**

**REQUIRED REPAIRS**

None.

## **SCHEDULE III**

### **ORGANIZATIONAL CHART**

(attached hereto)



## SCHEDULE IV

**ASSIGNMENT OF MANAGEMENT AGREEMENT**

(attached hereto)

CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT AND
SUBORDINATION OF MANAGEMENT AGREEMENT

THIS CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT ("Assignment") is made as of the [__] day of [_____], 20[__], by 262 EAST FORDHAM REALTY LLC, a New York limited liability company, having an address c/o Crown Acquisitions, Inc., 767 Fifth Avenue, 24th Floor, New York, New York 10153 (together with its permitted successors and permitted assigns, "Borrower"), in favor of MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company, having an address at 1585 Broadway, 10th Floor, New York, New York 10036 ("Lender"), and is acknowledged and agreed to by [_____], a [_____] having its principal place of business at [_____] ("Manager").

RECITALS:

A.     Borrower by its promissory note in the principal amount of the Loan, dated as of April 18, 2013, made by Borrower to Lender (the promissory note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note") is indebted to Lender in the principal sum of Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) advanced pursuant to the Loan Agreement of April 18, 2013, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement") in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Loan Agreement (the indebtedness evidenced by the Note, together with such interest accrued thereon, shall collectively be referred to as the "Loan"), principal and interest to be payable in accordance with the terms and conditions provided in the Loan Agreement.

B.     The Loan is secured by, among other things, a Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Security Instrument"), dated as of April 18, 2013, which grants Lender a first lien on the property encumbered thereby (the "Property"). All and any of the documents other than the Note, the Security Instrument and this Assignment now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of the Note as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, are referred to as the "Other Security Documents."

C.     Pursuant to a certain [_____] dated as of [_____], between Borrower and Manager (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Management Agreement") (a true and correct copy of which Management Agreement is attached hereto as Exhibit A), Borrower has employed Manager exclusively to rent, lease, operate and manage the Property by the terms of the Management Agreement.

      D.     Pursuant to the Management Agreement, Manager is entitled to certain management fees (the "<u>Management Fees</u>") for services rendered in connection with the management and operation of the Property.

      E.     Lender requires as a condition to the making of the Loan that Borrower assign the Management Agreement as set forth below.

AGREEMENT:

For good and valuable consideration the parties hereto agree as follows:

      1.     <u>Assignment of Management Agreement</u>.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, in the event of a Default by Borrower under the Note, the Security Instrument or any of the Other Security Documents, including but not limited to escrow agreements, and the failure of Borrower to cure such default within any applicable grace period.

      2.     <u>Subordination of Management Agreement</u>.  The Management Agreement and all rights and privileges of Manager thereunder are hereby and shall at all times continue to be subject and unconditionally subordinate in all respects to the lien, payment and terms of the Security Instrument, the Note, the Loan Agreement and the Other Security Documents and to any renewals, extensions, modifications, assignments, replacements, or consolidations thereof and the rights, privileges, and powers of Lender thereunder.

      3.     <u>Borrower's Covenants</u>.  Borrower hereby covenants with Lender that during the term of this Assignment:  (a) Borrower shall not transfer the responsibility for the management of the Property from Manager to any other person or entity without prior written notification to Lender and the prior written consent of Lender, which consent may be withheld by Lender in Lender's sole discretion; (b) subject to Section 7.2 of the Loan Agreement, Borrower shall not terminate, amend, cancel, modify, renew or extend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld; and (c) Borrower shall, in the manner provided for in this Assignment, give notice to Lender of any notice or information that Borrower receives which indicates that Manager is terminating the Management Agreement or that Manager is otherwise discontinuing its management of the Property.

      4.     <u>Estoppel</u>.  Manager and Borrower each represent and warrant that (a) Manager is an Affiliate of Borrower, Sponsor and Guarantor, (b) the Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment, (c) neither Manager nor Borrower is in default under any of the terms, covenants or provisions of the Management Agreement nor knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Management Agreement, (d) neither Manager nor Borrower has commenced any action or given or received any notice for the purpose of terminating the Management Agreement and (e) the Management Fees and all other sums due and payable to the Manager under the Management

- 2 -

Agreement have been paid in full.  For purposes of this Section 4, the term "Affiliate" shall mean, as to any Person (as defined in the Loan Agreement), any other person that, directly or indirectly, owns more than forty percent (40%) of, is in control of, is controlled by or is under common ownership or control with such person or is a director or officer of such person or of an Affiliate of such person.  As used in the foregoing definition, the term "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a person, whether through ownership of voting securities, by contract or otherwise.

5.      Agreement by Borrower and Manager.  Borrower and Manager hereby agree that upon the occurrence and during the continuance of an Event of Default during the term of this Assignment or upon the occurrence of any event which would entitle Lender to terminate the Management Agreement in accordance with the Loan Documents, Lender may direct the Borrower to terminate the Management Agreement and require Manager to transfer its responsibility for the management of the Property to a replacement management company appointed in accordance with the Loan Agreement, effective as of the date set forth in Lender's notice to Manager.  Following any such termination, all rents, security deposits, issues, proceeds and profits of the Property collected by Manager shall be applied in accordance with Lender's written directions to Manager.

6.      Lender's Right to Replace Manager.  Lender shall have the right to require Borrower to terminate the Management Agreement with respect to the Property and replace Manager with a Person which is not an Affiliate of, but is chosen by, Borrower and approved by Lender upon the occurrence of any one or more of the following events:  (a) at any time following the occurrence of an Event of Default or (b) if Manager shall (i) be insolvent or a debtor in a bankruptcy proceeding, (ii) be in default under the Management Agreement beyond any applicable notice and cure period, (iii) have engaged in gross negligence, fraud or willful misconduct or (iv) not manage the Property in accordance with the management practices of nationally recognized management companies managing similar properties in locations comparable to the related property.  Neither Manager nor any other party shall be entitled to a termination fee, liquidated damages or any other fees or payments as a result of the replacement of Manager as manager of the Property pursuant to the terms hereof.

7.      Subordination of Management Fees.  Borrower and Manager hereby agree that Manager shall not be entitled to receive any fee, commission or other amount payable to Manager under the Management Agreement for and during any period of time that any amount due and owing Lender under the Loan Agreement, the Note and the Security Instrument is not paid when due; provided, however, that Manager shall not be obligated to return or refund to Lender any fee, commission or other amount already received by Manager, and to which Manager was entitled under this Assignment.

8.      Consent and Agreement by Manager.  Manager hereby acknowledges and consents to this Assignment and agrees that Manager will act in conformity with the provisions of this Assignment and Lender's rights hereunder or otherwise related to the Management Agreement.  In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof, Manager shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate

- 3 -

such transfer no later than thirty (30) days from the date the Management Agreement is terminated.  Further, Manager hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Assignment; (b) that it shall, in the manner provided for in this Assignment, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property; and (c) except as permitted by the Loan Agreement, not amend in any material way any of the provisions or terms of the Management Agreement without the prior consent of Lender, which consent shall not be unreasonably withheld or delayed.

9.    Lender's Agreement.  So long as Borrower is not in default (beyond any applicable grace period) under this Assignment, the Note, the Security Instrument or the Other Security Documents, Lender agrees to permit any sums due to Manager under the Management Agreement to be paid directly to Manager.

10.    Notices.  All notices required or permitted hereunder shall be given to the addresses set forth on the first page of this Assignment in the manner as provided in the Loan Agreement.

11.    No Oral Change.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower, Lender or Manager, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

12.    Liability.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

13.    Inapplicable Provisions.  If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

14.    Governing Law.  **(a) THIS ASSIGNMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY BORROWER AND MANAGER, ACCEPTED BY LENDER AND CONSENTED AND AGREED TO BY MANAGER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS ASSIGNMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO**

- 4 -

THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND MANAGER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS ASSIGNMENT AND THE NOTE, AND THIS ASSIGNMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER, MANAGER OR LENDER ARISING OUT OF OR RELATING TO THIS ASSIGNMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK, GENERAL OBLIGATIONS LAW, AND BORROWER AND MANAGER WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER AND MANAGER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER AND MANAGER DO HEREBY DESIGNATE AND APPOINT:

WACHTEL MASYR & MISSRY LLP
885 SECOND AVENUE
NEW YORK, NEW YORK 10017

AS THEIR AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON EACH OF THEIR BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER AND/OR MANAGER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER AND/OR MANAGER, AS APPLICABLE, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER AND/OR MANAGER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS RESPECTIVE AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

15.     Headings, etc.  The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

- 5 -

16.     <u>Duplicate Originals; Counterparts</u>.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.     <u>Number and Gender</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.     <u>Secondary Market</u>.  Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment, the Loan Agreement, and the Other Security Documents to one or more investors in the secondary mortgage market ("<u>Investors</u>").  In connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the Other Security Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors.  All references to Lender herein shall refer to and include any such servicer to the extent applicable.

19.     <u>Miscellaneous</u>.   (a) Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

(b)     Wherever pursuant to this Assignment it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

(c)     Capitalized terms used herein, but not otherwise defined herein shall have the meaning set forth in the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF the undersigned have executed this Assignment as of the date and year first written above.

**BORROWER**:

**262 EAST FORDHAM REALTY LLC**, a New York limited liability company

By: _____
      Name:  Isaac Chera
      Title:  Authorized Signatory

**ACKNOWLEDGED AND AGREED TO:**

**<u>MANAGER</u>:**

**[_____], a [_____]**

By: _____
Name:
Title:

**LENDER**:

**MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC**, a New York limited liability company

By: _____
    Name:
    Title:

<u>EXHIBIT A</u>

MANAGEMENT AGREEMENT

(attached hereto)